730 F.2d 258
 116 L.R.R.M. (BNA) 2150, 116 L.R.R.M. (BNA) 3454,
16 Ed. Law Rep. 1049
 PROFESSIONAL ASSOCIATION OF COLLEGE EDUCATORS, TSTA/NEA, et
al., Plaintiffs- Appellants Cross-Appellees,
v.
EL PASO COUNTY COMMUNITY COLLEGE DISTRICT, et al.,
Defendants-Appellees,
El Paso County Community College District & Robert Shepack,
Defendants- Appellees Cross-Appellants.
 No. 82-1102.
 United States Court of Appeals,
Fifth Circuit.
 April 20, 1984.
 
 Robert E. Hall, Houston, Tex., Julia Penny Clark, Washington, D.C., for plaintiffs-appellants cross-appellees.
 Christie, Berry & Dunbar, Mark Berry, Edward W. Dunbar, El Paso, Tex., for El Paso and Shepeck.
 Charles R. Jones, El Paso, Tex., for defendants-appellees cross-appellants.
 Appeals from the United States District Court for the Western District of Texas.
 Before RUBIN, GARWOOD and JOLLY, Circuit Judges.
 ALVIN B. RUBIN, Circuit Judge:
 
 
 1
 An association of college faculty members and five individual educators seek vindication of their first amendment rights, which they contend were infringed by the action of a state college in attempting to destroy the association, in discharging one faculty member, and in discriminating against others. Having won partial relief as a result of the verdict of a jury that decided some issues in their favor, the educators seek additional relief and additional attorneys' fees. The association seeks a hearing on its claims, which the district court dismissed before trial. After full consideration of these and other issues, we reverse the order dismissing the association's claim; affirm the award of damages to George Marchelos; reinstate the jury verdict in favor of another educator, Isela Castanon; order the district court to modify the injunction it has issued; and vacate the award of attorneys' fees, remanding this issue for redetermination. In Part IIIB of this opinion, we deny reinstatement to Marchelos, Judge Rubin dissenting from that part only.
 
 I.
 
 2
 The Professional Association of College Educators (PACE) is an unincorporated association of faculty members of El Paso Community College which is operated by an agency of the State of Texas called the El Paso County Community College District ("The College"). Invoking 42 U.S.C. Sec. 1983, PACE and five individual faculty members sued The College, its president, and the members of its Board of Trustees, alleging that these defendants had tried to destroy PACE and a sister organization, the El Paso Community College District Association of Administrators, by threatening and intimidating their members and officers and by denying them privileges enjoyed by other faculty members. The plaintiffs attached to their complaint a "bill of particulars" that specified several instances of allegedly wrongful conduct. PACE and the individual plaintiffs sought damages and injunctive relief against future retaliatory and discriminatory acts. George Marchelos, who had been Dean of Curriculum and Instruction before being discharged, sought damages and reinstatement. Isela Castanon, an instructor in the child development program, sought damages for retaliatory actions and for reassignment to an undesirable schedule.
 
 
 3
 The plaintiffs focused their claims against Robert E. Shepack, the president of The College. They presented evidence that he was hostile to unions generally and wanted to destroy both PACE and the Association of Administrators, which he considered union-type organizations. Marchelos was president of the Association of Administrators and the moving force behind its formation. Castanon was active in PACE and in a faculty investigation of Shepack's hiring practices. She also assisted individual faculty members in filing and processing grievances.
 
 
 4
 The jury returned a verdict on special interrogatories for two of the five plaintiffs, awarding George Marchelos $7,500 for his discharge in violation of the first amendment, and Isela Castanon $2,500 for actions taken against her by The College in retaliation for filing grievances. It found, however, that Castanon would have been reassigned even if she had not undertaken protected activities. (The jury's verdict unfavorable to the other three individual plaintiffs has not been appealed.)[1]
 
 
 5
 The district court entered judgment awarding Marchelos the compensatory damages assessed by the jury against Shepack but denying him reinstatement. The court denied any award to Castanon on the basis that the jury's finding that she would have been reassigned even absent her protected activities precluded the recovery of damages for retaliation. In response to the plaintiffs' claim of attorneys' fees in the amount of $83,000 and $15,000 in costs, the court awarded only fees of $5,000.
 
 II.
 
 6
 Because the dismissal of PACE's claim occurred before trial, it was proper only if it appeared "beyond doubt" that PACE could prove "no set of facts in support of [its] claim which would entitle [it] to relief." Conley v. Gibson, 355 U.S. 41, 46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80, 84 (1957). As Professor Charles Alan Wright aptly sums up the rule, it "precludes final dismissal for insufficiency of the complaint except in the extraordinary case where the pleader makes allegations that show on the face of the complaint some insuperable bar to relief." C. Wright, Federal Courts 442 (4th ed. 1983).
 
 
 7
 The complaint alleged that The College had engaged in a deliberate program to retaliate against PACE's members and officers for the purpose of "destroy[ing] the effectiveness and proper functioning of PACE as an agent for its members." It alleged that the defendants sought to achieve this goal by "intimidat[ing] and harass[ing] present members of PACE or the Association of Administrators, [in order to] discourage them from continuing their membership in PACE and to frighten faculty employees not affiliated with PACE or the Association of Administrators to prevent them from joining or supporting the efforts of those organizations." It alleged also that the defendants had acted against each of the individual plaintiffs as part of this campaign to destroy PACE. These actions, according to the complaint, violated the plaintiffs' rights under the first and fourteenth amendments to associate for the advancement of their common interests in dealings with The College. The complaint also alleged that The College discriminated against PACE by denying it access to the campus mail service while granting that service to similar organizations in order to stifle PACE's exercise of first amendment rights. The relief sought for PACE included an injunction protecting the organization and its present and future members as well as an award of damages to the organization.
 
 
 8
 The first amendment protects the right of all persons to associate together in groups to further their lawful interests.[2] This right of association encompasses the right of public employees to join unions and the right of their unions to engage in advocacy and to petition government in their behalf. Thus, the first amendment is violated by state action whose purpose is either to intimidate public employees from joining a union or from taking an active part in its affairs or to retaliate against those who do.[3] Such "protected First Amendment rights flow to unions as well as to their members and organizers." Allee v. Medrano, 416 U.S. 802, 819 n. 13, 94 S.Ct. 2191, 2202 n. 13, 40 L.Ed.2d 566, 582 n. 13 (1974).
 
 
 9
 The issue is not, as the defendants appear to argue, whether a public employer is required to deal with a union or other employee association but whether, assuming the correctness of the allegations of the complaint, the state may set out to injure or destroy an association of public employees for the purpose of preventing the exercise of their first amendment rights. Although some of the acts alleged caused only insubstantial injury, the PACE claims are not trifling when viewed in their totality.[4] PACE need not show that it and its members are entitled to all relief claimed but only that they are entitled to some relief if their claims are proved. If the organization is entitled to relief, the redress might encompass claims that, standing alone, would not support an action.
 
 
 10
 The College also challenges PACE's contention that its constitutional rights were violated by the denial of campus mail services. There is, of course, no substantive first amendment right to use a state organization's facilities.[5] But even if The College has not made a public forum of campus mails, the first amendment forbids it to discriminatorily grant or deny parties other than the college access to the service as a means for advancing or discouraging particular points of view.[6] As we have noted, the complaint alleges that The College permitted organizations similar to PACE to use the campus mail service but denied PACE use of the service in order to stifle PACE's associative and expressive activities. The complaint on its face, therefore, states a basis on which relief could be granted if its allegations are proved.
 
 
 11
 Similar principles apply to PACE's claim that The College retaliated against PACE members when deciding formal college grievances. The Constitution does not require a public employer either to establish a grievance procedure or to respond to grievances lodged by its employees or their union. Smith v. Arkansas State Highway Employees, 441 U.S. 463, 465, 99 S.Ct. 1826, 1828, 60 L.Ed.2d 360, 363 (1979). Nevertheless, if a public employer voluntarily establishes a grievance procedure, then discriminates or retaliates against union members in administering that process, it violates the first amendment.[7] In Smith the Supreme Court denied relief because the plaintiff had made "no claim of retaliation or discrimination proscribed by the First Amendment," and the employer had not "tak[en] steps to ... discourage union membership or association." 441 U.S. at 465-66, 99 S.Ct. at 1828, 60 L.Ed.2d at 363. Here that very claim is asserted: the complaint alleged that such improper motives were behind the defendants' withdrawal of campus mail privileges and refusal to process the grievances of PACE members according to the terms of The College's written procedure. Those allegations, if proved, could furnish grounds for relief to PACE as part of, or even independent of, its basic claim of a general campaign to harass and retaliate against its members for exercising their rights of association. PACE and its members were entitled to an opportunity to prove the truth of their allegations and, if they succeeded in proving a violation, the extent of their injury and the need for an injunction.
 
 III.
 
 12
 Like other college administrators, Marchelos was employed on an annual contract lacking any provision for reemployment from one year to the next. There was evidence from which the jury might have found, as its verdict implies it did, that Marchelos had formed the Association of Administrators and had, as a result of this and other activities, incurred the enmity of President Shepack. The evidence also was sufficient to warrant the finding that, in reprisal for exercising first amendment rights, Shepack suspended Marchelos without pay and brought formal charges recommending to the Board of Trustees that he be discharged. The Trustees sustained three of Shepack's four charges and fired Marchelos before his contract of employment had ended. The three charges sustained by the Board were: recommending as Dean of Arts and Sciences that Professor Semones (another plaintiff) be given an extra teaching assignment for the summer of 1979 notwithstanding the Vice-President's announcement that there would be no overloads for the summer, failing to submit a proper form before taking leave in December 1978 and falsely stating how much leave he had taken, and placing "annoyance" telephone calls to Shepack's residence between 1:00 and 4:00 a.m. At the Board hearing on these charges, Marchelos' counsel attempted to prove that Marchelos was the victim of retaliation for his activities in the Administrative & Professional Forum and in the Association of Administrators, but the Trustees refused to hear all evidence except that directly relating to the formal charges.
 
 
 13
 The jury returned a verdict in favor of Marchelos on special interrogatories, finding that "a substantial or motivating factor for the discharge of George Marchelos was his associational activity." It also found that "the same decision as to [his] dismissal would not have been reached in the absence of his associational activities," and that $7,500 would compensate him for "the emotional distress, injury to his reputation and lost earnings which he sustained as a result of his discharge."
 
 
 14
 The district court entered judgment on the jury's verdict for damages in the amount of $7,500 but denied Marchelos reinstatement. That remedy would be "inappropriate," the court reasoned, because Marchelos had only a one-year contract when he was discharged. Since ten months of that year had elapsed before Marchelos was suspended, the trial court considered that the award of damages sufficiently compensated him for the remainder of his contract term.
 
 A.
 
 15
 The College argues that Marchelos' first amendment claim should not have been presented to the jury at all, because the Board of Trustees established substantial and sufficient grounds for his dismissal after an administrative hearing that comported with due process and produced a record supporting the Board's findings. Even if this is factually correct, despite the district court's contrary conclusion,[8] it is beside the point. When presented with a claim that a faculty member was discharged in retaliation for exercising first amendment rights, a federal court does not sit simply to review administrative findings or to measure the procedural regularity of the process.
 
 
 16
 In Robison v. Wichita Falls & North Texas Community Action Corp., 507 F.2d 245, 254-56 (5th Cir.1975), we held that a discharged public employee who had received due process in a hearing was not entitled to a full trial on his claim that the discharge was motivated by his exercise of first amendment rights. We instructed that district courts must hear evidence on the first amendment claim only if the employer gave no reasons, or if the court concluded that the stated reasons were "clearly insubstantial," or "substantial but not sufficient by themselves to justify the discharge." 507 F.2d at 255.[9] The premise of Robison was that, if the employer could show its decision was justified, inquiry into the actual motive for the decision was unnecessary unless the plaintiff could prove unequal treatment or selective enforcement. We rejected the employee's contention that his discharge would be invalid if based even partially on protected activity.
 
 
 17
 Two years after we decided Robison, however, the Supreme Court announced in Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), that the issue is not whether the discharge can somehow be objectively justified, but whether it was in fact improperly motivated. "Even though [the faculty member] could have been discharged for no reason whatever, and had no constitutional right to a hearing prior to the decision not to rehire him ..., he may nonetheless establish a claim to reinstatement if the decision not to rehire him was made by reason of the exercise of constitutionally protected First Amendment freedoms." Id. 429 U.S. at 283, 97 S.Ct. at 574, 50 L.Ed.2d at 481. If a nontenured faculty member is not rehired or is discharged, he must show "that his conduct was constitutionally protected, and that this conduct was a 'substantial [or] ... motivating factor' in the Board's decision not to rehire him." If he does so, then to defeat his claim, the Board must show "by a preponderance of the evidence that it would have reached the same decision ... even in the absence of the protected conduct." Id. 429 U.S. at 287, 97 S.Ct. at 576, 50 L.Ed.2d at 484 (emphasis added). In short, the question is not whether the employer justifiably could have made the same decision but whether it actually would have done so.[10]
 
 
 18
 Robison is patently inconsistent with the Mt. Healthy analysis, for an employer could hold a full hearing, satisfy the procedural requirements of due process, and nevertheless dismiss an employee for reasons that would not have led to dismissal in the absence of protected speech or association.[11] Since the Supreme Court decided Mt. Healthy, we have properly and consistently followed its lead and have never returned to the Robison rationale.[12]
 
 
 19
 The defendants challenge the sufficiency of the evidence to support the verdict on the basis that the jury found that no member of the Board of Trustees was motivated to discharge Marchelos for his associational activities. Shepack did not have authority to fire Marchelos, but only to recommend that he be fired; the Board of Trustees made the decision to fire him after a hearing. The jury also found, however, that Shepack was "so motivated" and that Marchelos would not have been dismissed "in the absence of his associational activities." Based on that verdict, the district court entered judgment for damages against Shepack alone.
 
 
 20
 The causation issue in first amendment cases is purely factual: did retaliation for protected activity cause the termination in the sense that the termination would not have occurred in its absence? It is not necessary that the improper motive be the final link in the chain of causation: if an improper motive sets in motion the events that lead to termination that would not otherwise occur, "intermediate step[s] in the chain of causation" do not necessarily defeat the plaintiff's claim. Bowen v. Watkins, 669 F.2d 979, 986 (5th Cir.1982).[13]
 
 
 21
 Here, the Board of Trustees stood between Shepack and Marchelos' dismissal, but the jury could conclude, as apparently it did, that the Board would not have considered dismissing Marchelos if Shepack had not brought charges in reprisal for protected activity. Thus, the jury's verdict is consistent with the conclusion that, but for Shepack's response to protected activity, the Board would not have discharged Marchelos.[14]
 
 
 22
 This principle parallels the rule earlier adopted by this court in a case involving allegations that an employee was transferred because of racially motivated complaints. London v. Florida Department of Health & Rehabilitative Services, 448 F.2d 655 (5th Cir.1971), cert. denied, 406 U.S. 929, 92 S.Ct. 1765, 32 L.Ed.2d 131 (1972). The district court in London held that the plaintiff's rights were not violated, because the board that actually made the transfer decision was not racially motivated. We disapproved that reasoning, stating:
 
 
 23
 It is much too superficial to reason that even though some of the complaints registered against plaintiff were racially motivated, London's rights were not impaired since the Welfare Board was not so motivated. Whatever the conscious motivations of the individual members of the Board, its decision to transfer London could remain discriminatory if founded upon testimony or evidence which was tainted by racial prejudice.
 
 Id. at 657.[15]
 
 24
 The evidence was sufficient to support the conclusion that all four of the charges Shepack lodged against Marchelos were pretexts to conceal his improper motive. Even though Marchelos admitted that he made three of the anonymous night-time calls, the jury concluded within reason that this conduct, together with the other episodes, would not have resulted in the discharge of a dean, save for the existence of a secret animus. The evidence also supports the jury's finding that defendants failed to establish that they would have discharged Marchelos even in the absence of his protected activity.
 
 
 25
 The defendants' contention that Shepack is absolutely immune to damages because his role in the Marchelos case was that of a prosecutor is spun from thread too thin to hold the weight put on it. Even if persons other than public prosecutors can claim prosecutorial immunity (a suggestion of dubious substance but one that we need not here finally weigh), Shepack was not a prosecutor in name or in fact. He was the college president, and the jury found that he was the principal actor in causing Marchelos' discharge.[16]
 
 
 26
 We, therefore, affirm the judgment awarding damages to Marchelos against Shepack.
 
 B.
 
 27
 (Part III B was prepared by Circuit Judge JOLLY. Circuit Judge GARWOOD concurs. Circuit Judge ALVIN B. RUBIN dissents for reasons assigned below.)
 
 
 28
 As we have noted, the district court denied reinstatement to Marchelos, reasoning that Marchelos had no security interest in his job because he had no reasonable expectation of continued employment beyond the expiration of his contract on August 31, 1979. The district court erred in denying reinstatement on this basis. We therefore remand this case for redetermination of whether Marchelos should be reinstated to his position as a dean of El Paso Community College.
 
 
 29
 As this opinion explains, the illegality of Marchelos' discharge results from the infringement of his first amendment rights of speech and association. First amendment employment termination cases are unlike cases that arise out of transgressions of fourteenth amendment due process rights. In fourteenth amendment wrongful discharge cases, both rights and remedy depend upon the individual's having a property interest in his job. Here, however, Marchelos need not show a property interest in order to assert his constitutional rights to freedom of speech and freedom of association. The Supreme Court clearly articulated this proposition in Mt. Healthy City Board of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), and we need look no further than that case to see the error in the district court's denial of reinstatement:
 
 
 30
 Doyle's claims under the first and fourteenth amendment are not defeated by the fact that he did not have tenure. Even though he could have been discharged for no reason whatever and had no constitutional right to a hearing prior to the decision not to rehire him, Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), he may nonetheless establish a claim to reinstatement if the decision not to rehire him was made by reason of his exercise of constitutionally protected first amendment freedoms. Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).
 
 
 31
 Id. at 283, 97 S.Ct. at 574, 50 L.Ed.2d at 481.
 
 
 32
 Under the Mt. Healthy analysis, once the plaintiff establishes that his discharge resulted from constitutionally impermissible motives, he is presumed to be entitled to reinstatement. Courts generally order reinstatement because they reasonably assume that in most cases the defendant would have continued to employ the plaintiff indefinitely if the plaintiff had not engaged in the objectionable but constitutionally protected conduct that led to his dismissal.
 
 
 33
 The right of reinstatement is not automatic and absolute, however. In unusual cases the defendant may show by a preponderance of the evidence that the plaintiff is not entitled to reinstatement as an appropriate remedy for his unlawful dismissal because his employment would have definitely terminated for some legitimate reason. If, for example, the defendant shows that the plaintiff's contract would not have been renewed at the end of the employment term for some economic, academic, administrative or policy reason, independent of reasons given for discharge, then the district court might be justified in denying reinstatement. The employee, of course, still would be entitled to monetary damages, at least in the amount of salary he would have earned during the time remaining on his contract. Reinstatement may not be an appropriate remedy because, as a practical matter, by the time the court must decide on an appropriate remedy, the contract term, which would not have been renewed for independent and lawful reasons, may have expired. To award reinstatement under these circumstances would do more than remedy the constitutional wrong perpetrated on the employee; it would reward him solely for exercising his constitutional rights. The Mt. Healthy case itself counsels against awarding such windfalls to prevailing employee plaintiffs. In Mt. Healthy, the Court said the law should not "place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing." Id. at 286, 97 S.Ct. at 575, 50 L.Ed.2d at 483. Although the issue in Mt. Healthy was determining causation for the purpose of establishing substantive liability, the Court's reasoning perforce is equally applicable to the remedy context.[17] We do note that on the record before us the college made no showing that Marchelos' contract would not have been renewed irrespective of the reasons associated with his discharge, but we cannot preclude the possibility of its being raised on remand.
 
 
 34
 The defendant also may avoid having the equitable remedy of reinstatement imposed upon it by proving by a preponderance of the evidence that the plaintiff has engaged in misconduct so serious that even when balanced against the school's violation of first amendment rights, equity would not be served by requiring reinstatement. Stated differently, an employee's misconduct surrounding his dismissal, or subsequent to his dismissal, may be so unjustified or opprobrious that he is in no position to demand equity. In evaluating the defendant's position, the court may focus on the degree to which his conduct may interfere with effective job performance or working relationships within the institution, as well as on the nature of the misconduct itself.
 
 
 35
 This principle of allowing the employer to resist the equitable remedy of reinstatement on the basis of equity is consistent with prior first amendment cases that have stopped short of holding that an unconstitutionally discharged employee has an absolute right to reinstatement. See Allen v. Autauga County Board of Education, 685 F.2d 1302, 1305 (11th Cir.1982). Cf. Abbott v. Thetford, 529 F.2d 695, 701 (5th Cir.1976) (reinstatement is an equitable remedy). Indeed, the principle is one firmly established in the law pertaining to wrongful discharge. See St. John v. Employment Development Department, 642 F.2d 273 (9th Cir.1981) (employee's arguably disloyal conduct justified transferring her to another department); Meyers v. I.T.T. Diversified Credit Corporation, 527 F.Supp. 1064 (E.D.Mo.1981) (lingering hostilities and fact that job had been contracted out to another company justified denial of reinstatement). See also N.L.R.B. v. Jacob E. Decker & Sons, 636 F.2d 129, 132 (5th Cir.1981) (employee convicted of a felony); N.L.R.B. v. E-Systems, Inc., 642 F.2d 118, 122 (5th Cir.1981) (employee impulsively vandalized property). We emphasize, however, that the court should deny reinstatement in a first amendment wrongful discharge case on the basis of equity only in exceptional circumstances. That reinstatement might have "disturbing consequences," Sterzing v. Ft. Bend Independent School Dist., 496 F.2d 92, 93 (5th Cir.1974), "revive old antagonisms," Abbott, 529 F.2d at 701, or "breed difficult working conditions," Allen, 685 F.2d at 1305, usually is not enough, nor specific enough, to outweigh the important first amendment policies that reinstatement serves. At some point, however, the probable adverse consequences of reinstatement can weigh so heavily that they counsel the court against imposing this preferred remedy.
 
 
 36
 We recognize a factor in this case that may, on remand, affect the district court's determination of Marchelos' right to reinstatement. The record shows that Marchelos engaged in serious misconduct by placing anonymous telephone calls to the residence of the president of the college. Marchelos admitted placing three of these calls--those that the police, using electronic equipment, traced directly to him. Although no independent evidence traces other calls to Marchelos, the record shows that over a period of ten weeks Shepack and his family were harassed by a series of anonymous telephone calls, often between 1:00 a.m. and 4:00 a.m., similar to the three Marchelos must admit he made. Such behavior seems to us to have been totally unjustified as a response, if that is what we are to take it to be, to Shepack's harassment of Marchelos. Marchelos does not attempt to justify this aberrant conduct, which appears at best to show imbalanced judgment. The conduct is all the more serious considering that Marchelos was employed by the college in a high-level position, specifically as a dean with major responsibilities. We do not now evaluate this conduct, except to note that such misuse of the telephone may be the basis for civil lawsuits and even of criminal charges.
 
 
 37
 Considering these facts, the district court, and not this court, properly should weigh all the factors relevant to the remedy ultimately chosen. Sterzing v. Ft. Bend Independent School District, 496 F.2d 92, 93 (5th Cir.1974). In the light of the evidence relating to the telephone calls, the college's claim that reinstatement is inappropriate in this case is not frivolous, and, unlike Judge Rubin, we would not decide as a matter of law that the college must reinstate Marchelos despite his behavior. The district court may conclude that Marchelos' conduct was, for some reason unknown to us, more justifiable or excusable than it appears, was not taken seriously by those concerned, or would not undermine others' respect for his judgment or undermine his effectiveness in working in the administration of the college. Applying the appropriate legal standards, the district court should consider the facts relating to Marchelos' right to reinstatement in the light of our comments here to determine whether it is an appropriate remedy in this case. The district court may take new evidence, or may decide the issue from the record before it. This, of course, we leave to the district court and its discretion.[18]IV.
 
 
 38
 Separate interrogatories were submitted to the jury on Castanon's two claims. On each claim the jury was asked whether Castanon's protected activity was a substantial or motivating factor in the defendants' actions toward her. On the first claim the interrogatory and the answer were:
 
 
 39
 Do you find, from a preponderance of the evidence, that the associational activity of Isela Castanon was a substantial or motivating factor in the decision of the defendants to cancel the educational assistance courses for which Ms. Castanon was responsible?
 
 
 40
 Answer: No.
 
 
 41
 On the second claim the interrogatory and the answer were:
 
 
 42
 Do you find, from a preponderance of the evidence, that the filing of grievances on her own behalf, or processing or attempting to process grievances on behalf of others, substantially or materially motivated the defendants, or any one or more of the defendants, to retaliate against Isela Castanon?
 
 
 43
 Answer: Yes.
 
 
 44
 The jury found that only Shepack was improperly motivated. It was then asked to decide whether the same decision would have been made in the absence of Castanon's protected activity with regard only to retaliation for her associational activity:
 
 
 45
 Do you find from a preponderance of the evidence that the same decision as to Isela Castanon's reassignment would have been reached in the absence of her associational activities?
 
 
 46
 Not surprisingly, having found that Castanon's reassignment had not been substantially motivated by her first amendment activity, the jury answered that question "Yes." No similar interrogatory was asked on the claim of retaliation for filing grievances. The defendants did not object to the absence of such an interrogatory.
 
 
 47
 The jury assessed no damages for Castanon's reassignment, but it assessed $2,500 for emotional distress caused by the retaliation against her for filing grievances. The district court's only reason for denying Castanon judgment for the $2,500 damages was that the jury's answer to the "same decision anyway" question on the reassignment claim barred the award of damages on the retaliation claim as a matter of law. That decision did not fulfill the court's obligation to give full effect to all of the jury's verdict if this can be done fairly and logically, in view of the evidence. See Miller v. Royal Netherlands Steamship Co., 508 F.2d 1103, 1106-07 (5th Cir.1975).
 
 
 48
 The "same decision anyway" interrogatory on which the district court relied to deny judgment to Castanon referred only to her "reassignment." "Reassignment" was the term that the defendants themselves used to refer to the cancellation of the courses Castanon had designed and her assignment to teach a different set of courses. The alleged retaliation for her participation in grievance activities was factually different--being scheduled to teach the "early-early" and the "late night" classes, as Castanon described it. Her claim was that the burdensome scheduling was undertaken to retaliate for her role in filing grievances and assisting with grievances. The evidence was uncontroverted that the first grievance in which Castanon played any role was in protest of her reassignment. A finding that the reassignment was based on valid reasons is in no way inconsistent with a finding that the defendants thereafter retaliated against her for filing and processing grievances concerning the reassignment.
 
 
 49
 The defendants argue that judgment could not properly be entered on the jury's verdict because the special interrogatory on "retaliation" asked the jury to make a conclusion of law rather than a finding of fact, and that the error in this regard was compounded by the district court's failure to define "retaliation" in its instructions to the jury. On this point, "the complete answer is that neither objection is subject to review by this Court because counsel made no timely objection to such instruction in the court below as positively required by Rule 51 of the Federal Rules of Civil Procedure." Little v. Green, 428 F.2d 1061, 1069-70 (5th Cir.1970), cert. denied, 400 U.S. 964, 91 S.Ct. 366, 27 L.Ed.2d 384 (1970). The defendants did not object in the district court to the submission to the jury of the "retaliation" issue, to the form of the special interrogatory on that issue, or to the absence of an instruction defining retaliation. Having failed to raise this issue below, the defendants cannot raise it here unless the district court committed an error "so fundamental as to result in a miscarriage of justice." Whiting v. Jackson State University, 616 F.2d 116, 126 (5th Cir.1980). That standard is not met here.
 
 
 50
 The district court should have rendered judgment in favor of Castanon for $2,500. Whether those damages should be assessed against Shepack or the College must be resolved by the district court on remand. The jury found that only Shepack was improperly motivated against Castanon, but, in assessing damages, it found that $2,500 "would compensate [her] for the emotional distress sustained as a result of the actions of the EL PASO COUNTY COMMUNITY COLLEGE with regard to her filing and processing of grievances." (Emphasis in original.) (The defendants made no objection to the form in which this special interrogatory was presented to the jury.) Read together, these findings may suggest that Shepack acted as an agent of the College when he violated Castanon's rights. Interpretation of the jury's findings, however, is reserved in first instance for the trial court. Moreover, as the charge was not objected to in this respect, if the jury findings are incomplete on this question, the district court may make appropriate findings. Fed.R.Civ.P. 49. Because that court considered damages against all defendants precluded by the jury's findings, it has not yet had an opportunity to address this question, as it will on remand.
 
 V.
 
 51
 In denying the application for fees and expenses, the district court made no findings on the number of hours reasonably spent in representing the plaintiffs on the claims they won or on the hourly rate that would be reasonable compensation for counsel's efforts. The court did not address at all the extent to which evidence relevant to the losing claims was also reasonably necessary to presentation of the successful claims. The reasons the district court gave for awarding just $5,000 were that only Marchelos was a prevailing party and the plaintiffs' counsel had spent more time than the court believed necessary.
 
 
 52
 The conclusion that only one of the plaintiffs was a prevailing party in the action was based upon the dismissal of PACE's claim and the denial of judgment to Castanon. Because those two rulings are reversed, the award of attorneys' fees must be vacated and remanded for reconsideration. Although PACE's right to recover fees must await the outcome of a trial of its claim, fees should be awarded for representation of Castanon on the claim that she won.
 
 
 53
 Apart from the "prevailing party" question, the district court must reconsider its decision because its findings are inadequate under the controlling precedent of this circuit. They consist of little more than a mechanical recitation of the twelve factors listed in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir.1974). The court gave no indication of how many hours it believed were reasonably expended in representing Marchelos, nor any hint of what it believed to be a reasonable hourly fee for counsel's services. It gave no intimation why it denied reimbursement of expenses.
 
 
 54
 The Supreme Court emphasized the importance of clear explanation of the calculation of attorneys' fees in Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The Court specifically urged articulation of the number of hours found to have been reasonably expended and the reasonable rate used as multiplier. When efforts have succeeded on some issues but not on others, "[t]he result is what matters." Id. 103 S.Ct. at 1940. The overall level of success is paramount in determining the reasonableness of time expended, not simply the proportion of asserted claims won to asserted claims lost.
 
 
 55
 This court has repeatedly and consistently vacated fee awards that are as vaguely explained as this one. We have held that district courts must do more than recite the twelve Johnson factors and announce a fee. In Copper Liquor, Inc. v. Adolph Coors Co., 624 F.2d 575, 582-83 (5th Cir.1980), we gave the district court a specific framework of analysis it should follow in applying the Johnson factors. The purpose of that analysis is to make certain that the basis of the district court's award is expressed, so that meaningful appellate review is possible.
 
 
 56
 Accordingly, we vacate the award of fees and remand for reconsideration and proper findings.
 
 VI.
 
 57
 On cross-appeal the defendants raise two additional issues. The first is a contention that the trial court did not give the defendants adequate time to present their defense. The second is an argument that the district court improperly granted an injunction prohibiting The College and "its officers, agents and employees from retaliating or discriminating against the Plaintiffs or any other employees due to their membership or association with ... [PACE] or any other lawful association of its employees."
 
 
 58
 The district court consistently applied pressure on both parties to shorten the trial. The trial judge told counsel, however, that he did not intend to keep either party from presenting any witnesses; he simply wanted them to move as fast as they could. According to the defendants-appellees' brief, defense counsel objected to the first specific schedule announced for presentation of the parties' cases. The court did not enforce that schedule against either party. Later the same day, the court altered the schedule, partly in response to the concern expressed by defense counsel. Defense counsel did not object to the new schedule. Later, after completing the questioning of his final witness, defense counsel gave no indication to the court that he had other witnesses that he would call if allowed more time, or that the defense would be prejudiced if required to rest. On the contrary, he simply stated, "We have nothing further. We rest, your Honor." Counsel said nothing else on this score until after the jury returned its verdict. Only then did he declare that the defendants had other witnesses they had wanted to call, and only then did he make an offer of proof.[19]
 
 
 59
 Rule 46 of the Federal Rules of Civil Procedure allows no appeal unless the "party, at the time the ruling or order of the court is made or sought, makes known to the court ... his objection to the action of the court and the grounds therefor ...." See Colonial Refrigerated Transportation Inc. v. Mitchell, 403 F.2d 541, 551-52 (5th Cir.1968); Golden Bear Distributing Systems v. Chase Revel, Inc., 708 F.2d 944, 951 n. 5 (5th Cir.1983). Rule 103(a) of the Federal Rules of Evidence requires both timely objection and an offer of proof as prerequisite to appeal from any ruling that has the effect of excluding evidence. In this case, objection and an offer of proof could be timely only before the jury retired, for the purpose of the rules requiring these procedures is to inform the trial judge of the substance of what counsel wishes to prove, at a time when the judge can still reconsider his ruling and make any changes deemed advisable. Colonial Refrigerated Transportation, 403 F.2d at 552.[20] The argument that the defendants were denied adequate time to present their case is, therefore, procedurally barred.
 
 VII.
 
 60
 The defendants attack the injunction on three grounds. They argue, first, that it is too broad and not sufficiently specific, second, that it is not supported either by findings of fact or record evidence, and, third, that, because Shepack was the only defendant found to have violated the plaintiffs' rights, the injunction cannot properly bind The College and its officers, agents, and employees.
 
 
 61
 The standards requiring specificity in injunctions are fully met here. These rules do not require "unwieldy" specificity, but only that the injunction "be framed so that those enjoined will know what conduct the court has prohibited." Meyer v. Brown & Root Construction Co., 661 F.2d 369, 373 (5th Cir.1981). The present injunction prohibits retaliation or discrimination against employees due to their membership or association with PACE or other lawful employee associations. It is difficult to understand how the defendants could have legitimate difficulty understanding what they are forbidden to do, or to imagine how the injunction could be more specific without attempting to catalog every conceivable means by which an employer might retaliate or discriminate against an employee.
 
 
 62
 Nor is the injunction too broad, in the sense of unduly prohibiting conduct dissimilar to the violations established. The district court has "broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past." NLRB v. Express Publishing Co., 312 U.S. 426, 435, 61 S.Ct. 693, 699, 85 L.Ed. 930, 936 (1941).
 
 
 63
 The district court made no express findings of fact in support of an injunction, as required by Federal Rule of Civil Procedure 65(d). While a court's failure to do so does not require that the injunction be reversed or vacated, particularly when there is a jury verdict on which an injunction can properly be based, the absence of findings does require some conjecture on our part. We must "examin[e] the record to determine if ... sufficient evidence supports the issuance of injunctive relief." Sampson v. Murray, 415 U.S. 61, 86 n. 58, 94 S.Ct. 937, 951 n. 58, 39 L.Ed.2d 166, 185 n. 58 (1974).
 
 
 64
 Insofar as the injunction forbids Shepack to take actions against Castanon, the reasons for its issuance are made patent by the jury's findings. There were two jury findings of retaliation by Shepack, supported by ample evidence of Shepack's general hostility and tendency to retaliate. The retaliation against Castanon was continuing as of the date of trial. The trial court could properly conclude that, in the absence of an injunction, Shepack would continue to retaliate against her.
 
 
 65
 Considering that Marchelos was denied reinstatement, we cannot infer with confidence the basis for granting him injunctive relief.
 
 
 66
 The injunction applies also to actions against members of PACE who were not parties in this suit. Intrusion of federal courts into state agencies should extend no further than necessary to protect federal rights of the parties. An injunction, however, is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in the lawsuit--even if it is not a class action--if such breadth is necessary to give prevailing parties the relief to which they are entitled. Meyer v. Brown & Root Const. Co., 661 F.2d 369, 374 (5th Cir.1981); Gregory v. Litton Systems, Inc., 472 F.2d 631, 633-34 (9th Cir.1972). Although PACE's claim was dismissed before trial, that organization is an inevitable beneficiary of any injunction protecting prevailing plaintiffs' right to associate with it. Without a statement of reasons, however, we cannot infer why protecting PACE's other members was necessary to relieve Castanon. Having dismissed PACE's claim, the district court could not have concluded that protecting all of the organization's members was necessary to grant it full relief as a prevailing party. Whether such injunctive relief should be afforded must await the trial of the PACE claims.
 
 
 67
 The injunction was framed to bind not only Shepack but also The College and its other subordinates. It was within the district court's discretion to frame an injunction so that it applied to persons other than Shepack. Rule 65(d) of the Federal Rules of Civil Procedure authorizes injunctions that are binding not only upon the parties to the action but also upon "their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." This rule reflects the longstanding rule of equity that an injunction can bind not just parties "but also those identified with them in interest, in 'privity' with them, represented by them or subject to their control. In essence it is that defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors ...." Regal Knitwear Co. v. NLRB, 324 U.S. 9, 14, 65 S.Ct. 478, 481, 89 L.Ed. 661 (1945).
 
 
 68
 We cannot perceive the basis for binding The College and others when the jury found that only Shepack was improperly motivated in his actions toward Marchelos and Castanon. Shepack is an agent of The College, not its deus ex machina. The district court might have concluded that The College's trustees merely rubber-stamped Shepack's recommendations after perfunctory hearings, and was therefore properly subject to the injunction as being "in active concert or participation" with him; without a statement of reasons for the injunction, however, we are unable to identify this as the basis for an order binding The College.
 
 
 69
 We must therefore vacate the injunction as it applies to The College and to persons other than Shepack and as it protects persons other than Castanon. Thus confined, reasons for the injunction are made patent by the jury's findings. A broader injunction may be appropriate if accompanied by a statement of reasons, particularly if PACE prevails against Shepack or The College on remand.
 
 
 70
 For these reasons the judgment is AFFIRMED insofar as it awards damages to Marchelos. It is REVERSED insofar as it denies damages to Castanon and dismisses the PACE action; and VACATED in its award of attorneys' fees and, in part, in its issuance of an injunction. In all other respects, the case is REMANDED for further proceedings consistent with this opinion.
 
 
 71
 ALVIN B. RUBIN, Circuit Judge, dissenting from Part III B.
 
 
 72
 Both reason and precedent compel me to dissent from the remand of George Marchelos' already amply proved claim to reinstatement, which my brethren attempt to explain in part IIIB above. A state employer may escape its duty to rehire a person discharged in violation of the first amendment, they say, if the employer shows either "that it would not have reinstated [the employee] irrespective of all reasons given for the discharge which the jury rejected," or that equity and fairness would be disserved by the remedy. This analysis is contrary to Supreme Court precedent and the established rule of this circuit. As mere reading of the test demonstrates, it substitutes an intricate and confusing instruction for the Supreme Court's lucid one. The test would permit The College to deny the victim of its wrongdoing the only remedy that can make him whole by invoking equity in the cause of injustice.
 
 
 73
 The standard for awarding reinstatement announced by the Supreme Court in Mt. Healthy is succinct and clear: once the plaintiff establishes that his constitutionally protected conduct was a substantial or motivating factor in the defendant's decision to fire him, the defendant must reinstate him unless it establishes "that it would have reached the same decision ... even in the absence of the protected conduct." Mt. Healthy, 429 U.S. at 287, 97 S.Ct. at 576, 50 L.Ed.2d at 484; Bueno v. City of Donna, 714 F.2d 484, 497 & n. 1 (5th Cir.1983) (Rubin, J., concurring specially). The "irrespective-of-all-reasons" defense appears to me either to stray from the Mt. Healthy test or to muddle its clarity.
 
 
 74
 The remainder of part IIIB departs from Mt. Healthy and our prior decisions. Under Mt. Healthy the sole question is causation: whether, but for the plaintiff's exercise of federal constitutional rights, the college would have extended his employment. This is causation in fact, not proximate cause. The majority provides The College with an additional defense against affording relief to the victim: whether, as a matter of fairness and equity, The College should do so. Fairness and equity appear due to the victim rather than to the tortfeasor. This defense permits the employer to escape the consequences of its own wrongdoing and may enable a state agency that has violated the first amendment to deny adequate relief to persons whose constitutional rights it has infringed. In any event it permits federal judicial intrusion even deeper into the administration of state schools, for the district court is now to probe the fairness and equity of reinstating an employee who has already been found to have been wrongfully discharged.
 
 
 75
 Reinstatement may indeed impose undesirable consequences. But the Supreme Court has already considered this concern and announced the test appropriate for addressing it. The teacher involved in the Mt. Healthy case had engaged in a variety of misconduct that might have sufficed independently to justify discharge. 429 U.S. at 287, 97 S.Ct. at 576, 50 L.Ed.2d at 483. His heated arguments with other teachers and students had provoked, on at least one occasion, a slap on the face; he had referred to students in his class as "sons of bitches"; and he had made obscene gestures to two female students. 429 U.S. at 282, 97 S.Ct. at 573, 50 L.Ed.2d at 480. To avoid "commanding undesirable consequences not necessary to the assurance of [first amendment] rights," the Court announced that the district court might deny reinstatement if the school proved on remand that it would not have renewed the teacher's contract even in the absence of his other, constitutionally protected conduct. Although the case was being remanded for this inquiry, the Court did not, as my brothers do, invite a wide ranging inquiry into the advisability of a continued employment relationship.
 
 
 76
 My brothers cite no first amendment cases denying reinstatement after jury findings that a public employee had been discharged because he exercised his right to associate with others to advance their common interests; nor can they. To the contrary, we have squarely held that a plaintiff who establishes discharge in violation of the first amendment is entitled to reinstatement notwithstanding consequential disruption that might be characterized as unfair or inequitable. Sterzing v. Fort Bend Independent School District, 496 F.2d 92, 93 (5th Cir.1974); Abbott v. Thetford, 529 F.2d 695, 701 (5th Cir.1976). "Reinstatement is a necessary element of an appropriate remedy in wrongful discharge cases." Abbott, 529 F.2d at 701. This remedy must not be denied an employee who has been the victim of retaliation for exercising his constitutional rights on the basis of past misconduct dredged up as an afterthought in order to inflict the same harm. "Enforcement of constitutional rights frequently has disturbing consequences," we have acknowledged, but "[r]elief is not restricted to that which will be pleasing and free of irritation." Sterzing, 496 F.2d at 93.
 
 
 77
 Damages cannot make the discharged employee whole, for he has lost not just past earnings but a job and the infinitely valuable, albeit intangible, status, reputation, and psychological benefits that, in our society, attend prestigious employment. Reinstatement is also essential to deter retaliatory discharges and to eliminate the chilling effect such a discharge may exert on other employees whose desire to speak out against the ruling powers is stilled by fear of a similar fate. For these reasons, the Eleventh Circuit recently adopted what has hitherto been the rule of our court and reversed a denial of reinstatement specifically justified by the district court as necessary to avoid inequity. Allen v. Autauga County Board of Education, 685 F.2d 1302, 1305-06 (11th Cir.1982). Citing our own precedent in Sterzing and a number of other Fifth Circuit cases, it said, "[r]einstatement is a basic element of the appropriate remedy in wrongful employee discharge cases and, except in extraordinary ones, is required."
 
 
 78
 It is possible to conceive of a truly extraordinary case in which reinstatement should be denied. Our record on appeal, read fairly, simply does not present such a case. Marchelos admitted having made three late-night calls in a single night. He explained that he had intended to "tell off" Shepack but had lost his nerve each time. The jury heard this and other evidence of the late-night calls; indeed, it heard that the College had discharged Marchelos after the Board of Trustees had sustained Shepack's charge that Marchelos had made the annoyance calls. Nevertheless, the jury found that the decision to dismiss Marchelos would not have been reached in the absence of his constitutionally protected activities.[1] The jury apparently concluded that Shepack would not ordinarily seek to fire a college dean who displayed what might merely be emotional instability under stress. The majority calls Marchelos' conduct "the basis for civil lawsuits and even of criminal charges." His behavior seems to me more aptly to demonstrate a need for counseling. A college president not bent on vindictiveness would probably suggest to a dean who demonstrated such a reaction to pressure that he take a rest and consult a doctor. It is therefore neither unfair nor inequitable to reinstate the dean and thus to make him whole in the only way that the constitutional wrong done him can be repaired.
 
 
 79
 The wrong done Marchelos by remanding the case for a rehearing would alone warrant dissent. The majority's departure from the Mt. Healthy standard and our own precedent so damage the protection of constitutional rights that they mandate my dissent from part IIIB of the opinion.
 
 
 
 [1]
 In its answers to the special interrogatories, the jury exonerated the individual members of the Board of Trustees, finding that only Shepack's antiunion animus caused the injury
 
 
 [2]
 E.g., Abood v. Detroit Bd. of Educ., 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977); Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); Brotherhood of Railroad Trainmen v. Virginia, 377 U.S. 1, 84 S.Ct. 1113, 1116, 12 L.Ed.2d 89, 93 (1964); NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958)
 
 
 [3]
 Smith v. Arkansas State Highway Employees Local 1315, 441 U.S. 463, 464-66, 99 S.Ct. 1826, 1827-28, 60 L.Ed.2d 360, 362-63 (1979); Alabama State Federation of Teachers v. James, 656 F.2d 193, 197 (5th Cir.1981); United Steelworkers of America v. Univ. of Alabama, 599 F.2d 56, 61 (5th Cir.1979); Orr v. Thorpe, 427 F.2d 1129, 1131 (5th Cir.1970)
 
 
 [4]
 Compare Raymon v. Alvord Indep. School Dist., 639 F.2d 257 (5th Cir.1981), in which the only injury suffered was a patently insubstantial difference in a student's grade score
 
 
 [5]
 See Connecticut State Fed'n of Teachers v. Bd. of Educ. Members, 538 F.2d 471 (2d Cir.1976)
 
 
 [6]
 Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, ----, 103 S.Ct. 948, 955, 74 L.Ed.2d 794, 805 (1983); Ysleta Fed'n of Teachers v. Ysleta Indep. School Dist., 720 F.2d 1429 at 1431-1434 (5th Cir.1983)
 
 
 [7]
 Alabama State Fed'n of Teachers v. James, 656 F.2d 193, 197 (5th Cir.1981); Henrico Professional Firefighters Ass'n Local 1568 v. Bd. of Supervisors, 649 F.2d 237, 241 (4th Cir.1981)
 
 
 [8]
 The district court found that the Board hearing did not afford Marchelos a meaningful opportunity to be heard because Marchelos was prevented from presenting evidence that the charges were retaliatory
 
 
 [9]
 We derived this analysis from Furguson v. Thomas, 430 F.2d 852, 859 (5th Cir.1970), in which we stated that the findings of a school board considering the termination of an instructor are entitled to great weight in federal courts if the instructor was accorded due process and the board had before it substantial evidence to support its conclusion. We recognized, however, that an unconstitutional result could be reached despite procedural and substantive regularity and therefore carefully avoided holding that federal courts are bound by the determinations of college disciplinary boards. "Since Sec. 1983 vests original and not appellate jurisdiction in the district courts, the findings of a college board of directors or similar school review agency are not to be accorded the stature of findings of a district court ... or the findings of a federal agency subject to review under the Administrative Procedure Act." Id. at 859. Furguson, therefore, cannot support The College's argument that a district court errs by considering a claim asserted to be inconsistent with a finding of the Board of Trustees
 
 
 [10]
 Ayers v. Western Line Consol. School Dist., 555 F.2d 1309, 1315 (5th Cir.1977), rev'd on other grounds, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979); Avery v. Homewood City Bd. of Educ., 674 F.2d 337, 339-40 (5th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 2119, 77 L.Ed.2d 1300 (1983); Bowen v. Watkins, 669 F.2d 979, 985, (5th Cir.1982); Love v. Sessions, 568 F.2d 357, 360 (5th Cir.1978)
 
 
 [11]
 See Bueno v. City of Donna, 714 F.2d 484, 496-97 (5th Cir.1983) (Rubin, J., concurring specially) (first amendment violated by discharge motivated in part by protected activity notwithstanding existence of permissible reasons for discharge)
 
 
 [12]
 See Stewart v. Bailey, 561 F.2d 1195 (5th Cir.1977), granting reh'g of 556 F.2d 281 (5th Cir.1977); Goss v. San Jacinto Junior College, 588 F.2d 96 (5th Cir.1979), modified on reh. on other grounds, 595 F.2d 1119 (5th Cir.1979); Truly v. Madison Gen. Hosp., 673 F.2d 763 (5th Cir.1982), cert. denied, 459 U.S. 909, 103 S.Ct. 214, 74 L.Ed.2d 170 (1983)
 In Stapp v. Avoyelles Parish School Bd., 545 F.2d 527, 534 (5th Cir.1977), we reiterated the Robison rule in dictum. The Stapp opinion was published six days after Mt. Healthy was decided. It does not cite Mt. Healthy, however, and nothing in the opinion suggests that the parties had called Mt. Healthy to the court's attention in the brief period between its announcement and the rendition of Stapp. Indeed, because the printing of our opinions requires at least ten to fourteen days, the decision in Stapp was doubtless signed and sent to the printer before Mt. Healthy was published. No subsequent petition for rehearing called Mt. Healthy to the panel's attention. Therefore, we regard Mt. Healthy as intervening contrary authority, see Robinson v. Parsons, 560 F.2d 720, 721 n. 2 (5th Cir.1977), notwithstanding its publication before Stapp. Cf. Hernandez v. City of Lafayette, 643 F.2d 1188, 1192-93 & n. 9 (5th Cir.1981), cert. denied, 455 U.S. 907, 102 S.Ct. 1251, 71 L.Ed.2d 444 (1982).
 The College argues that we have applied Robison in three other decisions after Mt. Healthy: Bowling v. Scott, 587 F.2d 229 (5th Cir.1979), cert. denied, 444 U.S. 835, 100 S.Ct. 69, 62 L.Ed.2d 45 (1979), Viverette v. Lurleen B. Wallace State Junior College, 587 F.2d 191 (5th Cir.1979) and White v. South Park Independent School District, 693 F.2d 1163 (5th Cir. 1982). This simply reflects a misreading of our opinions. Bowling and Viverette adjudicated due process claims, not a first amendment claims. Obviously, Mt. Healthy did not undermine our prior decisions regarding claims unrelated to protected speech and association. In we did adopt administrative findings on first amendment issues after determining that the findings were substantially supported by the administrative record. The parties in White, however, had submitted their case to the district court for decision based on the administrative record and other stipulations. Because neither party sought de novo hearing, there was no reason to scrutinize the compatibility of the Robison analysis and Mt. Healthy.
 
 
 [13]
 We do not consider whether a subsequent dramatic event might effectively defeat the claim of a discharged employee to reinstatement. Thus, we intimate no opinion concerning the situation that would be presented if an unconstitutionally discharged employee were later caught burglarizing his employer's office to gain incriminating evidence to support his claim
 
 
 [14]
 Damages were awarded to Marchelos against Shepack only, and not against The College or its Board members. Marchelos does not challenge the judgment in this respect. Our opinion, therefore, considers only the liability of the individual defendant Shepack
 We intimate no opinion concerning what the result should be, as a matter of law, if the facts established that the Board independently reached the decision to discharge Marchelos separated from and uninfluenced either by Shepack's recommendation or by the charges brought by him. This case does not present a situation in which charges were initiated by an illegally motivated person but the authority who made the decision had neither illegal motive nor illegal influence, and we intimate no opinion concerning such a case.
 
 
 [15]
 Cf. Johnson v. Duffy, 588 F.2d 740, 743-44 (9th Cir.1978); Allen v. Autauga County Bd. of Educ., 685 F.2d 1302, 1304 (11th Cir.1982); Hickman v. Valley Local School Dist. Bd. of Educ., 619 F.2d 606, 610 (6th Cir.1980); Flores v. Pierce, 617 F.2d 1386, 1390-91 (9th Cir.), cert. denied, 449 U.S. 875, 101 S.Ct. 218, 66 L.Ed.2d 96 (1980); Simineo v. School Dist. No. 16, 594 F.2d 1353, 1356-57 (10th Cir.1979)
 
 
 [16]
 In McLaughlin v. Tilendis, 398 F.2d 287, 290 (7th Cir.1968), the Seventh Circuit rejected a claim of absolute immunity for a school superintendent, saying, "To hold defendants absolutely immune from this type of suit would frustrate the very purpose of Section 1983."
 
 
 [17]
 Our decision in this part of the opinion relates only to the law of remedies. It does not, as Judge Rubin suggests, undermine the "but for" causation test set forth by the Supreme Court in Mt. Healthy. The causation analysis of Mt. Healthy applies only to determine substantive liability when dismissal is the result of dual motives
 
 
 [18]
 Our holding in this case is entirely consistent with that of the Eleventh Circuit in Allen v. Autauga County Bd. of Educ., 685 F.2d 1302 (11th Cir.1982), cited by both the majority and the dissent in this case. Allen recognized that in exceptional cases reinstatement might be inappropriate, but held that the case before it did not present such exceptional circumstances. Id. at 1205. In Allen, unlike the present case, the district court reviewed the reinstatement issue under appropriate legal standards and denied reinstatement because it would "breed difficult working conditions." The Eleventh Circuit Court of Appeals held that reason to be insufficient as a matter of law. Id. We do not adopt or reject that holding, but wish merely to allow the district court to evaluate the facts in this case initially, applying the correct legal standards, to determine the appropriateness of reinstating Marchelos
 
 
 [19]
 Defense counsel said that, absent the time limitation, he would have called The College's Vice-President to testify about Marchelos' misuse of leave time and the order not to assign summer overloads; a Mr. Green (apparently a personnel employee) to testify about the misuse of leave time; and two officials at another college to testify that after his discharge, Marchelos told them he had left El Paso Community College by mutual agreement due to philosophical differences. This evidence would only have supported the basis for the Board's action; it would not have controverted the evidence that the discharge would not have occurred absent Marchelos' first amendment activities
 
 
 [20]
 Accord United States v. Lara-Hernandez, 588 F.2d 272, 273-74 (9th Cir.1978)
 
 
 [1]
 Thus, the jury's findings imply that the incident "was not taken seriously by those concerned." Under these circumstances, reinstatement is compelled even under the analysis set forth in part IIIB