# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-CT-00258-SCT

*EAST MISSISSIPPI STATE HOSPITAL, THE MISSISSIPPI DEPARTMENT OF MENTAL HEALTH, DR. RAMIRO J. MARTINEZ AND ROGER McMURTRY*

*v.*

*JIMMY B. CALLENS*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 10/26/1999 |
| TRIAL JUDGE: | HON. L. BRELAND HILBURN |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | OFFICE OF THE ATTORNEY GENERAL BY: LAWRENCE ARTHUR SCHEMMEL |
| ATTORNEY FOR APPELLEE: | MARY MARVEL FYKE |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED, AND THE JUDGMENT OF THE CIRCUIT COURT IS AFFIRMED IN PART AND REVERSED AND RENDERED IN PART - 04/15/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.    We are requested today in this appeal to revisit our prior decisions which require a state employee to exhaust certain statutorily mandated administrative remedies prior to invoking the judicial process which, pursuant to statute, provides for only limited judicial review based on the administrative record. In so doing we must consider the remedies available to a state employee who alleges that his termination from state

employment was in retaliation for his lawful exercise of certain rights or for other improper reasons. The employee in this case sought relief through state administrative procedures, first through his former employer and then through the Employee Appeals Board (EAB). Upon receiving an adverse decision from the EAB hearing officer, the aggrieved employee did not appeal to the full Board pursuant to Miss. Code Ann. § 25-9-131, but instead filed an original action in state court and was awarded damages by a jury plus an award by the trial judge of attorneys' fees and expenses, as well as damages under the Mississippi Tort Claims Act (MTCA). In an effort to strictly adhere to our prior case law, a divided Court of Appeals reversed the jury verdict, and trial court judgment consistent therewith, and rendered judgment for the defendants, finding that the grievance procedure before the EAB was the exclusive remedy for a state employee to pursue claims based on violations of state or federal rights. We accepted the Court of Appeals' invitation to grant certiorari. Having now revisited the critical issues presented to us, and upon mature consideration, we reverse the judgment of the Court of Appeals and affirm in part and reverse and render in part the judgment of the trial court.

## FACTS AND PROCEEDINGS BEFORE THE ADMINISTRATIVE AGENCY AND THE TRIAL COURT

¶2.    In its opinion, the Court of Appeals provided the following statement of facts in this case:

> Jimmy B. Callens was terminated from his state position as Program Director for the Adolescent Unit of the East Mississippi State Hospital prior to the end of his one-year probationary period. Callens, believing his termination to be unjustified, pursued his grievance through procedures set out in the Mississippi State Employee Handbook but was unsuccessful in obtaining any relief from the employing agency, the Mississippi State Department of Mental Health. His contention was that he was terminated for his efforts to correct, or at least expose, improper treatment of some of the patients by the hospital staff.

2

Callens perfected an appeal of his termination to the Employee Appeals Board, an arm of the State Personnel Board charged by statute with conducting de novo inquiries into adverse personnel actions when requested to do so by the affected state employee. Callens's appeal was dismissed by the hearing officer designated to conduct the hearing on motion of the employing agency. The agency's motion sought dismissal on the ground that Callens was a probationary employee who could be discharged at will, with or without cause, and thus was without any basis in fact to appeal his dismissal. The hearing officer dismissed the appeal for lack of jurisdiction, finding that under the Appeals Board rules, the only grounds on which a probationary employee could appeal his dismissal, were claims for various forms of discrimination that did not extend to First Amendment free speech claims. Callens did not appeal that decision to the full Employee Appeals Board. By his failure to do so, he likewise forfeited any right under the applicable statute to seek further review of that decision by way of an appeal to the judicial branch as authorized by Mississippi Code Annotated Section 25-9-132 (Rev.1999).

Instead, one year later, Callens filed this original action in the Circuit Court of the First Judicial District of Hinds County in which he asserted a claim for damages advancing two alternate theories of liability. The first was that his termination was due to the exercise of his First Amendment right to speak out on matters of public concern, such a claim being actionable under 42 U.S.C. § 1983 (1994). Alternatively, Callens asserted that his firing was in retaliation for his reporting improper operations at East Mississippi State Hospital, thus making his termination actionable under Mississippi common law as an exception to the employee-at-will doctrine first recognized in *McArn v. Allied Bruce-Terminix Co.*, 626 So.2d 603, 607 (Miss.1993).

The case proceeded to trial and the jury was instructed to deliberate Callens's claims under 42 U.S.C. § 1983 (1994). The jury returned a verdict in favor of Callens in the amount of $125,000. The trial court, concluding that Callens's separate claim under *McArn* was cognizable under the Mississippi Tort Claims Act, proceeded to determine that claim separately from the bench and awarded Callens an additional $50,000 in damages. Callens filed a post- verdict motion for attorney's fees and court expenses. The trial court granted such fees in the amount of $114,569.14.

*East Miss. State Hosp. v. Callens*, No. 2000-CA-00258-COA, at ¶¶ 2-5 (Miss. Ct. App. Dec. 18, 2001). The following additional facts are likewise relevant. Jimmy B. Callens, Ph.D., was a probationary employee at the East Mississippi State Hospital (EMSH, or Hospital), and Dr. Ramiro J. Martinez was the Hospital director. Callens's duties largely involved working with adolescent girls who were confined for

drug abuse or other asocial behaviors. After several months on the job, Callens felt that Martinez was not interested in reforming various deficiencies that Callens perceived in patient care and staff discipline, and he wrote to Roger McMurtry, Dr. Martinez's superior at the Mississippi Department of Mental Health (MDMH), outlining his complaints. Callens's immediate supervisor, Tom Elliott, held a conference with Callens in which he was highly critical of Callens for having gone over the heads of his immediate superiors, and four days later Callens was fired.

## PROCEEDINGS BEFORE THE COURT OF APPEALS

¶3.    After the circuit court jury verdict in favor of Dr. Callens, EMSH and the other state defendants, MDMH, Martinez, and McMurtry, appealed to this Court, and the case was assigned to the Court of Appeals. A divided Court of Appeals found that, under this Court's precedent, the grievance procedure before the Employee Appeals Board was the exclusive remedy for a state employee to pursue an action under the provisions of 42 U.S.C. § 1983. Also, the Court of Appeals found that this exclusive remedy applied to Callens even though he was a probationary employee. The Court of Appeals further found that judicial estoppel did not apply because the State had not argued that the Board lacked jurisdiction to hear Callens's claim; rather, the Board found that Callens had failed to state a claim upon which relief could be granted. Finally, the Court of Appeals found that, while this Court's decision in *Hood v. Mississippi Department of Wildlife Conservation*, 571 So.2d 263 (Miss. 1990), left unanswered certain questions concerning the appropriate procedural guidelines to be utilized by a state employee attempting to pursue a § 1983 claim through the EAB process, as an intermediate appellate court it was duty-bound to follow *Hood* and its progeny.

4

¶4. The Court of Appeals' concurrence and dissent opined that United States Supreme Court decisions were controlling and mandated that Callens should be allowed to proceed as he had on his § 1983 claim in state court. The dissent further opined that this Court's decision in *Hood* was inconsistent with these United States Supreme Court decisions and was thus preempted.

## DISCUSSION

¶5. Callens argues: (1) that requiring him to litigate his action under 42 U.S.C. § 1983 through a state administrative remedy violates the Supremacy Clause of the Constitution; (2) that forcing him to seek relief from the alleged wrongdoer through the state administrative remedy also violates the Supremacy Clause; (3) that the state administrative remedy does not apply to him; and, (4) that the issue of punitive damages should have been submitted to the jury. The first three issues are combined and restated for clarity as follows:

> **I. WHETHER THE ADMINISTRATIVE REMEDY PROVIDED TO CALLENS THROUGH THE EMPLOYEE APPEALS BOARD WAS HIS SOLE AVAILABLE REMEDY FOR AN ALLEGED 42 U.S.C. § 1983 CAUSE OF ACTION.**

¶6. Callens asserts that the decision of the Court of Appeals was "grievously violative of the Supremacy Clause of the United States Constitution....." However, we unhesitatingly acknowledge that while expressing concerns about the perceived procedural quagmire wrought by our decision in *Hood v. Mississippi Department of Wildlife Conservation*, 571 So.2d 263 (Miss. 1990), the Court of Appeals, while not unanimous in its decision, zealously adhered to the *Hood* pronouncements in reaching its decision. Likewise, Callens was not timid about his assessment of our decision in *Hood*. Callens's cert. petition also asserted that "*Hood* runs wholly afoul of the United States Supreme Court's pronouncements

5

regarding state-promulgated rules and their application to [42 U.S.C.] § 1983 claims." We acknowledge the appropriateness of Callens's assertions consistent with the notions of fair and zealous advocacy.

¶7.     Since our prior decision in *Hood* is the focus of today's appeal, we first review the facts in *Hood* and our pronouncements contained therein. Hood was terminated from his position with the Mississippi Department of Wildlife Conservation (DWC)[1] in 1985 because of a conviction for conspiracy to commit voter fraud. Hood appealed his discharge to the EAB, which affirmed in January 1986. Hood did not seek judicial review of the Board's decision. On appeal of his criminal conviction, this Court, based on certain irregularities in the grand jury proceedings, reversed Hood's conviction and ordered his indictment quashed. *Hood v. State*, 523 So.2d 302, 311 (Miss. 1988). Prior to the Copiah County Grand Jury's further consideration of Hood's case in light of our decision, Hood chose to instead waive a grand jury indictment and enter a no contest (nolo contendere) plea on a bill of information, whereupon the trial court accepted Hood's no contest plea, adjudicated Hood guilty of the charged offense based on the record before the court, and sentenced Hood to a six-month suspended jail sentence and payment of a fine.

¶8.     Several months later, feeling vindicated by the manner in which his criminal proceedings had been concluded, Hood sought DWC reinstatement to his previous position; however, DWC denied Hood's request. Without seeking his available statutory remedies via administrative appeals, followed by judicial review, Hood simply filed suit (only against the DWC) in the Copiah County Chancery Court, alleging

---

[1]The DWC was formerly known as the State Game and Fish Commission.

wrongful termination and refusal to reinstate, and asking for monetary and punitive damages.[2] The chancery

court dismissed Hood's action, stating that the EAB's administrative process was Hood's exclusive remedy.

¶9.      On appeal this Court affirmed.  As to the question of whether the Board's administrative process

was adequate to consider 42 U.S.C. § 1983 claims, this Court found:

> We see no reason why DWC and thereafter the Employee Appeals Board were not
> wholly competent to consider every claim Hood asserts in the present complaint, including
> the grounds for his Section 1983 claims. State law provides that civil service employees
> such as Hood may be discharged only for "inefficiency or other good cause," Miss. Code
> Ann. § 25-9-127 (Supp. 1990). Federal and state constitutions may afford one such as
> Hood additional protections in his employment. The remedial process provided such
> employees necessarily vests the employee's department, agency or institution, and
> ultimately the EAB, with full authority to hear not only the merits vel non of any charge of
> inefficiency or other good cause, but also any other matter of fact or law the employee may
> assert affecting his employment. We take Section 25-9-131(3)'s directive that the appeals
> procedure there provided "replace any existing statutory procedure" as declaring this the
> employee's exclusive remedy.
>
> Hood may have presented before DWC and thereafter before the EAB every ground for
> relief he asserts in the present complaint, including his federal claims.  Section 1983 merely
> serves as a method for asserting claims of violation of constitutional rights, the act
> containing no substantive provisions in and of itself. ***Chapman v. Houston Welfare
> Rights Organization***, 441 U.S. at 618, 99 S.Ct. at 1916;[3] ***Estate of Himelstein
> v. City of Fort Wayne, Indiana***, 898 F.2d 573, 575 (7th Cir. 1990); ***Trigg v. Fort
> Wayne Community Schools***, 766 F.2d 299, 300 (7th Cir. 1985). The more relaxed
> administrative appellate process before EAB is quite conducive to a full airing of the
> employee's constitutional claims. On judicial review the circuit court is specifically charged
> to consider whether EAB's action abridged "some ... constitutional right of the employee."
> Miss. Code Ann. § 25-9-132 (Supp. 1990). On final review, the employee's
> administrative remedies thus exhausted, he may before the Circuit Court pursue all avenues
> of relief Section 1983 makes available. *See **Presnell v. Pell***, 298 N.C. 715, 260 S.E.2d

---

[2]No individual was sued in an official or personal capacity.

[3]The full cite of ***Chapman***, found earlier in the ***Hood*** opinion, is 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979).

7

611 (1979), and particularly ***Johnston v. Gaston County***, 323 S.E.2d 381 (N.C.App. 1984). Such claims are within this Court's competence.

***Hood***, 571 So.2d at 268. Despite this endorsement of the administrative process for hearing § 1983 claims, this Court also mentioned the following in a footnote: "Of course, the administrative agencies (DWC and EAB) have no authority to order the plethora of relief available in judicial proceedings involving Section 1983." ***Hood***, 571 So.2d at 268 n.4.

¶10. Callens cites, and the Court of Appeals' dissent relied on, the United States Supreme Court decisions in ***Patsy v. Board of Regents***, 457 U.S. 496, 102 S. Ct. 2557, 73 L. Ed. 2d 172 (1982), and ***Felder v. Casey***, 487 U.S. 131, 108 S. Ct. 2302, 101 L. Ed. 2d 123 (1988). In ***Patsy*** the Supreme Court found that a person raising § 1983 claims was not required to first exhaust state administrative remedies. In ***Felder***, the Court found that a Wisconsin notice-of-claim statute was preempted where there was an attempt to apply such a statute in a state court § 1983 action. The Supreme Court found that (a) notice of claim statutes create a burden on litigants in state actions that is absent from the same litigation in federal courts; (b) the state court litigant is given an unfairly short amount of time to recognize that he has been deprived of a federal constitutional right; (c) Congress never intended that claimants under § 1983 be required first to submit their claims to the government responsible for their injuries; (d) notice of claim statutes are enacted primarily for the benefit of governmental defendants; and, (e) a state law that alters the outcome of § 1983 claims depending solely on whether they are brought in state or federal court within that state would be preempted. The Court in ***Felder*** also warned that "forms of local practice" could not be used to defeat a federal right. 487 U.S. at 138.

8

¶11. The Court of Appeals appropriately acknowledged the United States Supreme Court's decision in *Felder*, but found that since *Hood* was decided by this Court two years after *Felder*, *Hood* was controlling. In fact, on this point, the Court of Appeals stated:

> Whether [the statutory] procedure, commencing as an administrative matter before a body having the authority to consider constitutional claims such as the ones Callens asserts, but unable, at least at the administrative level, to provide the relief unequivocally made available under 42 U.S.C. § 1983 (1994), could escape a claim that it was a "form of local practice" having the real potential to unduly impede the prosecution of such a claim raises troubling questions.

*Callens*, at ¶ 15.

¶12. This Court subsequently considered a similar question in *Wright v. White*, 693 So.2d 898 (Miss. 1997). Wright and other employees of the State Department of Health resigned, alleging that they had done so because of violations of their state and federal rights. They began the administrative process through the Employee Appeals Board. After presenting testimony but before completion of the EAB proceeding, Wright and the others filed suit in Hinds County Circuit Court. The Board then attempted to transfer the matter to the circuit court. The circuit court dismissed the complaint and vacated the transfer. Wright appealed. This Court found that "no aspect of the statutes creating the EAB gives it authority to transfer a pending state employment matter to circuit court, and because such a transfer is contrary to *Hood* and the statutory method of administrative appeal and judicial review, the lower court's vacating the order of transfer and dismissing the complaint is affirmed." *Wright*, 693 So.2d at 903. As for Wright's argument that state civil service procedure was preempted by 42 U.S.C. § 1983, this Court found that the issue was procedurally barred because it had not been raised in the trial court. As to the merits of the question, this Court further found that Wright could not sue the state, state agencies or state officials, acting

9

in their official capacity, in state court under 42 U.S.C. § 1983, citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989). Certain instructive language in *Wright* is crucial to our determination in the case sub judice:

> This Court's decision in *Hood* further confirms that where the Legislature has created a civil service scheme which provides an express statutory method of judicial review and appeal of the decisions of administrative bodies, that statutory method may not be ignored in favor of an original action in chancery court or circuit court. *See also, Scott v. Lowe*, 223 Miss. 312, 78 So.2d 452 (1955); *Tennant v. Finane*, 227 Miss. 410, 86 So.2d 453, (1956).
>
> .............................................
>
> The state civil service statute and system of administrative appeal or judicial review is not unconstitutional or contrary to the federal "Supremacy Clause" because, as a matter of federal law, state agencies cannot be sued for damages in state court under Section 1983. Section 1983 does not itself provide any substantive rights. Instead, it is simply the federal statutory vehicle through which claims of alleged violations of federal constitutional rights may be brought and remedied under certain circumstances. *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617, 99 S.Ct. 1905, 1915-16, 60 L.Ed.2d 508 (1979).

693 So. 2d at 902, 904.

¶13.     There is indeed at least one procedural similarity between *Wright*, where an attempt was made to transfer an action from EAB to the circuit court, and the case sub judice, where the circuit court action was filed after the EAB hearing officer dismissed Callens's case. However, our inquiry does not end here, because we are genuinely concerned about Callens's § 1983 claims against state employees in their personal (individual) capacities. Notwithstanding our prior decisions in *Hood* and *Wright*, we do find certain factual and procedural distinctions when compared to our case today. We reveal at this point that our decision today does indeed hinge on the official vs. individual capacities of the individual defendants in the case sub judice. On the other hand, *Hood* and *Wright* are factually distinguishable in that *Hood*

10

involved a suit only against a state agency, and *Wright* involved the issue of whether the EAB had statutory authority to transfer a pending matter to the circuit court. Additionally, in *Wright* this Court, based on a procedural bar, expressly declined to address the issue of whether the applicable civil service statutes were preempted by § 1983. Again, we emphasize that both *Hood* and *Wright*, involved suits against state agencies and state officials acting in their official capacities. In reviewing the record before us, including the pleadings, we note that Callens's original complaint makes no reference to persons acting in their official or personal capacities. Miss. R. Civ. P. 9(a) requires that "[t]he capacity in which one sues or is sued must be stated in one's initial pleading." The trial court's May 25, 1999, final judgment entered on the jury verdict reflects the language, "We, the jury, find for the Plaintiff and assess damages at $125,000.00..........Accordingly, the Court hereby enters judgment in favor of the Plaintiff in the amount of $125,000.00." After the trial court later conducted a bench trial to consider damages under the MTCA, a final judgment was entered on October 26, 1999, setting out that "the Court hereby enters judgment in favor of the Plaintiff in the amount of $289,569.14."[4]

¶14.    While the United States Supreme Court has held that state officials can be subject to personal liability in § 1983 actions, *Hafer v. Melo*, 502 U.S. 21, 26-27, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991), it has also held that state agencies and state employees sued in their official capacities are not subject to liability in § 1983 actions. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

---

[4]We mention here that a painstakingly review of the record in this case, including the trial transcript, orders, judgments, etc., fails to reveal against whom the jury verdict and judgment is rendered. We know only that the judgment is in favor of Dr. Callens.

## A. Official v. Personal Capacities of Martinez and McMurtry.

¶15.    The U.S. Supreme Court has explained the difference in the § 1983 context between personal and official liability:

> On the merits, to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right. More is required in an official-capacity action, however, for a governmental entity is liable under § 1983 only when the entity itself is a " 'moving force' " behind the deprivation; thus, in an official-capacity suit the entity's "policy or custom" must have played a part in the violation of federal law.

*Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L. Ed. 2d 114 (1985) (citations omitted).  The Court observed that "[i]n many cases, the complaint will not clearly specify whether officials are sued personally, in their official capacity, or both. 'The course of proceedings' in such cases typically will indicate the nature of the liability sought to be imposed. *Brandon v. Holt*, 469 U.S. 464, 469, 105 S. Ct. 873, 877, 83 L. Ed. 2d 878 (1985)."  473 U.S. at 167 n.14.  In *Brandon*, while the complaint did not distinguish in what capacity the official was being sued, the plaintiffs' subsequent pleadings stated that he was being sued in his official capacity.  *Brandon*, 469 U.S. at 469-70.

¶16.    Furthermore, in *Hafer v. Melo*, 502 U.S. at 24 in the context of recognizing the right to sue state officials in their personal capacities under § 1983, the Court made the following observation:

> The Third Circuit looked to the proceedings below to determine whether certain respondents brought their claims for damages against Hafer in her official capacity or her personal capacity. 912 F.2d, at 635- 636. Several other Courts of Appeals adhere to this practice. *See Conner v. Reinhard*, 847 F.2d 384, 394, n. 8 (CA7), cert. denied, 488 U.S. 856, 109 S.Ct. 147, 102 L.Ed.2d 118 (1988); *Houston v. Reich*, 932 F.2d 883, 885 (CA10 1991); *Lundgren v. McDaniel*, 814 F.2d 600, 603-604 (CA11 1987). Still others impose a more rigid pleading requirement. *See Wells v. Brown*, 891 F.2d 591, 592 (CA6 1989) (§ 1983 plaintiff must specifically plead that suit for damages is brought against state official in individual capacity); *Nix v. Norman*, 879 F.2d 429, 431

12

(CA8 1989) (same). Because this issue is not properly before us, we simply reiterate the Third Circuit's view that "[i]t is obviously preferable for the plaintiff to be specific in the first instance to avoid any ambiguity." 912 F.2d, at 636, n. 7. See this Court's Rule 14.1(a) ("Only the questions set forth in the petition, or fairly included therein, will be considered by the Court").[5]

The Fourth Circuit states that "the majority view" is that no specific capacity need be pled in the complaint. *Biggs v. Meadows*, 66 F.3d 56, 59-60 (4th Cir. 1995) (citing cases from the Second, Third, Fifth, Seventh, Ninth, Tenth, and Eleventh Circuits (the majority view); and, the Sixth and Eighth Circuits (the minority view)).[6] The court went on to give practical guidance on how the capacity of the defendants should be construed:

> Under the standard we now adopt, when a plaintiff does not allege capacity specifically, the court must examine the nature of the plaintiff's claims, the relief sought, and the course of proceedings to determine whether a state official is being sued in a personal capacity. **One factor** indicating that suit has been filed in such a manner might be the plaintiff's failure to allege that the defendant acted in accordance with a governmental policy or custom, or the lack of indicia of such a policy or custom on the face of the complaint. *See Hill v. Shelander*, 924 F.2d 1370, 1374 (7th Cir.1991) (finding a personal capacity claim where "the unconstitutional conduct alleged involves [the defendant's] individual actions and nowhere alludes to an official policy or custom that would shield him from individual culpability"). **Another indication** that suit has been brought against a state actor personally may be a plaintiff's request for compensatory or punitive damages, since such relief is unavailable in official capacity suits. The nature of any defenses raised in response to the complaint is an **additional relevant factor**. Because qualified immunity is available only in a personal capacity suit, *Kentucky v. Graham*, 473 U.S.

---

[5]This quote appears in a footnote appearing in *Hafer*, 502 U.S. at 24; however, there is no footnote number but merely "FN*" to indicate the footnote.

[6]Since *Biggs*, the D.C. Circuit has also adopted the "course of proceedings" approach. *Daskalea v. Dist. of Columbia*, 227 F.3d 433, 448 (D.C. Cir. 2000).

State courts have likewise adopted this approach. *Carrillo v. State*, 817 P.2d 493, 497 (Ariz. Ct. App. 1991); *State v. Nieto*, 993 P.2d 493, 508 (Colo. 2000) (even where complaint named defendants in official capacity, course of proceedings may indicate otherwise); *Orozco v. Day*, 934 P.2d 1009, 1013 (Mont. 1997) (where damages sought, personal capacity should be inferred; "any other construction would be illogical").

13

159, 167, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985), the assertion of that defense indicates that the defendant interpreted the plaintiff's action as being against him personally. Throughout, the underlying inquiry remains whether the plaintiff's intention to hold a defendant personally liable can be ascertained fairly.

66 F.3d at 61 (some citations omitted & emphasis added). Thus, for § 1983 actions, three factors emerge as crucial in a determinating whether defendants have been sued in their personal (individual) or official capacities. The factors are: (1) allegations in the complaint, (2) nature of relief sought, and (3) nature of defenses pled. These factors expand on the Fifth Circuit's own test, which is confined to the first factor. **Parker v. Graves**, 479 F.2d 335, 336 (5th Cir. 1973) (per curiam).

¶17.   Callens's complaint filed in Hinds County Circuit Court clearly distinguished the causes of action alleged and the types of relief that he sought:

> COMES NOW the Plaintiff, Jimmy B. Callens . . . and hereby files this his Complaint for monetary damages against East Mississippi State Hospital, Mississippi Department of Mental Health, Dr. Ramiro J. Martinez . . . and Mr. Roger McMurtry . . . for their violation of Mississippi common law in their wrongful termination of him, **as well as for Martinez's and McMurtry's violation of his First Amendment Rights and resultant violation of 42 U.S.C. § 1983.**

(emphasis added). As the first paragraph of his complaint shows, and as the rest of the pleading bears out, Callens sought § 1983 relief against only the individual defendants, Martinez and McMurtry. Only they are mentioned in count one of the complaint, which raises the § 1983 claim, whereas the wrongful termination claim in count two is brought against "all Defendants." The style of the complaint also listed those defendants without any indication as to whether they were being sued in their official or personal capacities.

¶18.   In the present case, the pertinent allegations of the complaint clearly focus on the actions of the individual defendants as being actionable under § 1983, and there is no § 1983 claim against the state agencies which were also sued. Indeed, no § 1983 relief is available against state agencies and state

employees sued in their official capacities. ***Will v. Mich. Dep't of State Police***, 491 U.S. at 71. Callens thus appropriately sought § 1983 relief only against the individual defendants, not against the agencies. State officials *are* subject to personal liability via § 1983 in their individual capacities. ***Hafer v. Melo***, 502 U.S. at 26-27. The State argues that the complaint does not contain any concrete allegations against the individual defendants which would support an inference of personal liability; however, as already revealed, the allegations of Callens's complaint do indeed sufficiently charge the individual defendants in their personal capacities.

¶19.   Notwithstanding our decision in ***Hood***, we conclude from our objective research that federal-law complaints against persons in their individual capacities are not required to go through the Employee Appeals Board. Callens's § 1983 action did not seek reinstatement or any other review of his employment status. Instead, Callens sought money damages from the individual defendants for their alleged violation of his First Amendment rights. Because of this, and because individuals in their personal capacities may be sued for First Amendment violations under §1983, ***Hafer***, 502 U.S. at 26-27; ***Aucoin v. Haney***, 306 F.3d 268, 271 (5th Cir. 2002), the § 1983 claim against Martinez and McMurtry was properly before the circuit court. In so holding that, notwithstanding our existing statutorily mandated administrative remedies, a state employee may judicially pursue § 1983 actions in state court against state officials in their personal or individual capacities, we must still consider the issue of qualified immunity.

### B. Did Martinez and McMurtry Enjoy Qualified Immunity?

¶20.   The question remains as to whether the individual defendants, Martinez and McMurtry, enjoyed qualified immunity from suit under § 1983. They raised this defense in their pleadings, including their motion

15

to dismiss (or in the alternative for summary judgment). The circuit court summarily denied the motion without explanation.

¶21.    It is well established that Mississippi courts exercise concurrent jurisdiction with their federal counterparts over § 1983 claims. *Felder v. Casey*, 487 U.S. at 147; *Maine v. Thiboutot*, 448 U.S. 1, 3 n.1, 100 S. Ct. 2502, 65 L. Ed. 2d 555 (1980); *Barrett v. Miller*, 559 So. 2d 599, 564 (Miss. 1992). The elements of the cause of action under § 1983, however, "are defined by federal law," as are the defenses against them. *Howlett v. Rose*, 496 U.S. 356, 375, 110 S. Ct. 2430, 110 L. Ed. 2d 332 (1990).

### 1. *The Legal Test for Qualified Immunity.*

¶22.    Denial of summary judgment on the ground of qualified immunity is reviewed de novo. *Id.* This case is unlike most federal precedents on qualified immunity in the § 1983 context, however, because it is an appeal from a full trial on the merits. In the federal courts, interlocutory appeals may be taken when the district court denies a defendant's motion for summary judgment on the basis of qualified immunity. *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985).[7] Here, this Court is presented with a jury's findings of fact. Thus, we are required to conduct a regular de novo review on questions of law, while treating the facts as we would in an appeal from a denial of JNOV.

¶23.    This Court has restated its test for qualified immunity in the § 1983 context:

> The test for qualified immunity is twofold. First, the court must determine whether a public official's conduct deprived a § 1983 plaintiff of a "clearly established" constitutional or statutory right. The constitutional right must be sufficiently clear to place a reasonable

---

[7]There is, however, no federal right to such an interlocutory appeal in state court. *Johnson v. Fankell*, 520 U.S. 911, 922-23, 117 S. Ct. 1800, 138 L. Ed. 2d 108 (1997).

official on notice that certain conduct violates that right. Vague or general assertions of constitutional deprivations are not sufficient, and a § 1983 plaintiff must state with specificity the constitutional right he alleges has been violated. Second, qualified immunity protects a public official even if that official has violated a clearly established right if the official's conduct was objectively reasonable.

*Williams v. Lee County Sheriff's Dep't*, 744 So. 2d 286, 292 (Miss. 1999) (citations omitted).[8]

¶24.    According to the Fifth Circuit, a First Amendment retaliation claim against individual defendants under § 1983 requires that the plaintiff show (1) that he was engaging in a protected activity, (2) that he suffered an adverse employment action, and (3) that there was a causal connection between the two. *Beattie v. Madison County Sch. Dist.*, 254 F.3d 595, 599 (5th Cir. 2001). The protected-activity analysis must include a determination whether the plaintiff had a greater interest in commenting on a matter of public concern than the defendants had in protecting the efficiency of the workplace. *Kinney v. Weaver*, 301 F.3d 253, 268 (5th Cir. 2002). Once the plaintiff shows that the protected speech activity was a motivating factor, the burden shifts to the defendants to prove by a preponderance of the evidence (4) that they would have implemented the adverse employment action even in the absence of the protected speech. *Id.* at 601 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977)). Both the causation questions are for the jury to decide. *Shands v. City of Kennett*, 993 F.2d 1337, 1343 (8th Cir. 1993).

¶25.    Obviously, termination is an adverse employment action. *See, e.g., Zaffuto v. City of Hammond*, 308 F.3d 485, 493 (5th Cir. 2002). Also, there can be no serious question that Callens's

---

[8]The Fifth Circuit has framed the test in three parts by dividing the first step into (1) whether a constitutional right was violated and (2) whether that right was clearly established at the time of the alleged violation, *Aucoin*, 306 F.3d at 272; however, the test as stated in *Williams* is essentially the same as that stated in *Aucoin*.

17

letter to McMurtry was protected speech. The welfare of patients at a state hospital is a matter of public concern. *See Price v. Brittain*, 874 F.2d 252, 258 (5th Cir. 1989) ("Without doubt, the welfare of the patients at [a state mental health] facility and the protection of their civil rights are matters of serious public concern."); *Roth v. Veterans' Admin.*, 856 F.2d 1401, 1406 (9th Cir. 1988) (citing *Schwartzman v. Valenzuela*, 846 F.2d 1209, 1210 (9th Cir. 1988) (staff psychologist's criticism of patient mistreatment was protected speech)). Also, the public has an interest in government employees' freedom to "blow the whistle" on improper practices, as Callens did in his letter to McMurtry: "A public employee who engages in whistle blowing does not forfeit his protection against governmental abridgement of freedom of speech if he decides to express his views privately rather than publicly." *Price*, 874 F.2d at 258 (citations & internal quotation marks deleted).

¶26. Even if Callens's speech were on a matter of public concern and led to his dismissal, the court must still apply the *Pickering* balancing test to determine whether the government's interests as an employer outweighed the plaintiff's right as a citizen to speak out. *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968). The government's interest in suppressing a whistle blower, however, is unlikely to be augmented by considerations of efficiency or decorum:

> Government employees are often in the best position to know what ails the agencies for which they work; public debate may gain much from their informed opinions. And a government employee, like any citizen, may have a strong, legitimate interest in speaking out on public matters. In many such situations the government may have to make a substantial showing that the speech is, in fact, likely to be disruptive before it may be punished.

*Waters v. Churchill*, 511 U.S. 661, 674, 114 S.Ct. 1878, 128 L.Ed. 2d 686 (1994) (plurality opinion) (citations omitted).

¶27. The Seventh Circuit has outlined the factors to be considered:

> *Pickering* contemplates a highly fact-specific inquiry into a number of interrelated factors: (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place, and manner of the speech; (5) the context within which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decision-making; and (7) whether the speaker should be regarded as a member of the general public. Greer, 212 F.3d at 371.
>
> *Pickering* balancing is not an exercise in judicial speculation. While it is true that in some cases the undisputed facts on summary judgment permit the resolution of a claim without a trial, that means only that the *Pickering* elements are assessed in light of a record free from material factual disputes. Here, after the trial, we must conduct this inquiry in light of the full record viewed in the light most favorable to the jury's verdict.

*Gustafson v. Jones*, 290 F.3d 895, 909 (7th Cir. 2002). We note that, like this Court today, the court in *Gustafson* was confronted with an appeal subsequent to a jury verdict.

¶28. The defendants' basis for arguing that their interest in protecting the workplace outweighed Callens's interest in speaking out, is that Callens stepped outside the chain of authority by going straight to McMurtry rather than through Martinez.

¶29. "Mere allegations of disruption are insufficient to put the *Pickering* balance at issue." *Sexton v. Martin*, 210 F.3d 905, 912 (8th Cir. 2000). *Accord*, *Branton v. City of Dallas*, 272 F.3d 730, 741 (5th Cir. 2001). In *Sexton*, police officers had gone to the media to voice their complaints. 210 F.3d at 912. The court ruled that, in the absence of actual showing of disruption, there was not even an issue of the *Pickering* balance; moreover, had the balance been weighed, the "meager showing of workplace disruption" would not have outweighed the public concerns raised by the officers' complaints. *Id.* at 912-13.

¶30.	The Tenth Circuit has recognized that going straight to the public with one's concerns, rather than first trying to resolve them within the organization, may weigh against the employee. *Lee v. Nicholl*, 197 F.3d 1291, 1296 n.1 (10th Cir. 1999). While going outside the normal chain of command may weigh against the employee, the seriousness of the public concern and the level of actual disruption sustained are also factors to consider. *Johnsen v. Indep. Sch. Dist. No. 3 of Tulsa County, Okla.*, 891 F.2d 1485, 1490 n.4 (10th Cir. 1989).

¶31.	Recognizing that police departments have a special interest in workplace harmony, the Eighth Circuit held that a plaintiff's "failure to follow the chain of command called into question his working relationship with his superior officers and at least potentially impaired the police chief's ability to control the actions of his subordinates and maintain the discipline required by the department to insure public safety." *Tyler v. City of Mtn. Home*, 72 F.3d 568, 570 (8th Cir. 1995). The court held that deviation from the chain of command gave the employer a legitimate reason to demote the employee, although the court did not discuss the opposite side of the balance. *Id.* However, in another case involving a police department, where the plaintiff had some reason for believing that complaints through normal channels would be fruitless (so that the "partial breach of the chain of command in this case was not simply a whimsical disregard for authority"), the importance of protecting whistle blowing outweighed the department's concerns for order, especially where the employee's "private call to an authority positioned to make a quick investigation and resolution of the alleged improprieties was less disruptive to the City and its police department than other forms of communication which [the employee] might have chosen." *Brockell v. Norton*, 732 F.2d 664, 668 (8th Cir. 1984).

20

¶32.	In the present case, Callens unquestionably went over Martinez's head to McMurtry, Martinez's immediate supervisor. This act weighs against Callens; however, Callens testified that his previous complaints had failed to produce any interest from his superiors.[9] Also, Callens worked in a hospital, not a police department, and while good working relations are important to every government workplace, the special factors relating to public safety are not ordinarily as prevalent in a hospital setting as in a police setting. Further, Callens was speaking on a matter of unquestionable public concern, the alleged odious abuse and neglect of minors in the State's care. Callens did not call up the local television news channel or request an interview with a newspaper reporter; he instead kept his complaints within the MDMH. Finally and perhaps most importantly, the defendants failed to show any serious disruption as a result of Callens's letter. Any disruption was caused by their own anger at his having gone outside channels, not by any deleterious effect on workplace morale.

¶33.	In the end, we conclude that the ***Pickering*** balancing test weighs in favor of Callens.

### 2. The Two Causation Questions for the Jury.

¶34.	We consider the causation issue in two parts. First of all, Callens had the burden of proving by a preponderance of the evidence that his letter to McMurtry was a motivating factor in his termination. Because it found for Callens, the jury obviously determined that Callens had met his burden of proof. The

---

[9]Callens's letter to McMurtry also stated: "The failure and frustration resulting from my having attempted to resolve these issues through normal channels is now responsible for my bringing these concerns to your attention." As to whether Callens made a sufficient effort "through normal channels," ***Gustafson***'s principle that "we must conduct this inquiry in light of the full record viewed in the light most favorable to the jury's verdict" is no doubt applicable.

State vigorously disputes that verdict. This Court reviews denials of motions for judgment notwithstanding the verdict by its familiar standard:

> Under this standard, this Court will consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, we are required to reverse and render. On the other hand if there is substantial evidence in support of the verdict, that is evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required.

*Coho Res., Inc. v. McCarthy*, 829 So. 2d 1, 8-9 (Miss. 2002) (quoting *Gen. Motors Acceptance Corp. v. Baymon*, 732 So. 2d 262, 268 (Miss. 1999). The Fifth Circuit has stated that "The causation issue in first amendment cases is purely factual: did retaliation for protected activity cause the termination in the sense that the termination would not have occurred in its absence?" *Prof'l Ass'n of Coll. Educators, TSNA/NEA v. El Paso County Cmty. Coll. Dist.*, 730 F.2d 258, 266 (5th Cir. 1984).

¶35.    The State challenges whether the jury had sufficient evidence to find any causal connection between Callens's letter and his firing. Callens points to the tape-recorded conference he had, prior to his termination, with his immediate superior, Tom Elliott, who strongly reproached Callens for sending the letter to McMurtry. Elliott, testifying for the defense, stated that he had sent a transcript of this conference to Martinez no later than the Friday before Callens was terminated on the following Monday; whereas, Martinez claimed that he first learned of Callens's letter to McMurtry, when he (Martinez) called McMurtry to tell him that he was firing Callens. The jury also heard deposition testimony from Callens's co-worker, James Gardner, in which Gardner stated that Elliott had told him that the letter "was one of the reasons"

22

for the firing.[10] Callens also testified that Elliott's statements at their conference demonstrated a knowledge of the letter's contents. Since Martinez was Elliott's supervisor, it is reasonable to believe that McMurtry would have shared the letter with Martinez rather than with Elliott, and that Martinez had then shown Elliott the letter. When considering all the evidence and the reasonable inferences which may be drawn from the evidence in the light most favorable to Callens, and in also considering the short interval between discovery of the letter by his superiors and his termination, a reasonable jury certainly could have found by a preponderance of the evidence that the letter was a motivating factor in the termination of Callens. Likewise, the jury would have been justified in disbelieving McMurtry's testimony that when he mentioned the letter to Martinez after Martinez called him to advise him of Callens's termination, Martinez's response was "What letter?"

¶36.    While the facts recounted by Callens and other witnesses suffice to uphold a jury verdict against Martinez, they will not suffice to uphold that verdict against McMurtry. There is no evidence to support a finding that McMurtry told Martinez to fire Callens, and there is no respondeat superior liability under § 1983. *Monell v. Dep't of Soc Servs.,* 436 U.S. 658, 691-92, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978); *Ware v. Unified Sch. Dist. No. 492*, 881 F.2d 906, 912 (10th Cir. 1989).

¶37.    Callens urges that McMurtry be held liable under a "deliberate indifference" standard, which is a "stringent" one. *In re Foust*, 310 F.3d 849, 862 (5th Cir. 2002). "Liability of a supervisor under § 1983 must be predicated on the supervisor's deliberate indifference, rather than mere negligence. *Woodward v. City of Worland*, 977 F.2d 1392, 1399 (10th Cir. 1992). "[S]upervisory liability requires 'allegations

---

[10]Gardner disputed this in his trial testimony and was vigorously impeached with his deposition testimony.

of personal direction or of actual knowledge and acquiescence.'" *Id.* at 1400 (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990)). *Langley v. Adams County*, 987 F.2d 1473, 1481 (10th Cir. 1993). "Mere failure to investigate" a subordinate's decision to terminate an employee does not rise to deliberate indifference. *San Filippo v. Bongiovanni*, 30 F.3d 424, 446 (3d Cir. 1994). In *San Filippo*, the senior supervisory authority had "reason to suspect that San Filippo's prior protected activities had been a substantial motivating factor in the decision to initiate dismissal proceedings." *Id.* The Third Circuit held that this was sufficient to create a jury question as to "whether the ultimate decision-maker acted with deliberate indifference to the plaintiff's first amendment rights by approving the recommendation that the plaintiff be dismissed." *Id.* Relying on the U.S. Supreme Court's plurality opinion in *Waters v. Churchill*, the court acknowledged that

> By holding that the University may be held liable if a fact-finder finds that the Board of Governors was deliberately indifferent to the possibility that dismissal proceedings were initiated against San Filippo in retaliation for the exercise of his first amendment rights, we similarly require his employer to "tread with a certain amount of care" to avoid "the possibility of inadvertently punishing someone for exercising [his] First Amendment rights."

*Id.* at 446 n.26 (citing *Waters*, 511 U.S. 661).

¶38. Informed of Callens's termination, McMurtry asked whether the letter was a factor, was told that it was not, and went on to inquire as to the reasons for Callens's termination, upon which Martinez supplied McMurtry with neutral, valid justifications. McMurtry's actions thus amounted to "treading with a certain amount of care." Callens did not present sufficient evidence to the jury to implicate McMurtry under the "stringent" standard imposed by the case law. Thus, we find that find that McMurtry enjoyed qualified immunity.

24

¶39.    The second causation question for the jury was whether Martinez met his burden of proving by a preponderance of the evidence that the decision to fire Callens would have been made even if Callens had not written the letter to McMurtry.  Martinez alludes to Callens having been accused by co-workers of inappropriate sexual behavior toward certain female patients. Martinez also focuses on Callens's alleged professional deficiencies.

¶40.    In response, counsel for Callens called as witnesses two former patients (including one patient who had supposedly been subjected to his sexual misconduct), who denied any misbehavior by Callens and who instead praised Callens for his concern of his patients.[11]   Callens's counsel also impeached defense witnesses with evidence of  their positive opinions about Callens's work before the letter and prior to his commencement of the lawsuit.  Despite Callens's supposed sexual misconduct in June, he was not terminated until September, and no professional, legal, or disciplinary proceedings were ever conducted against him on the basis of that supposed misconduct.  Therefore, the jury could reasonably have concluded from that evidence and from the ex-patients' testimony, that Martinez did not take those charges seriously, especially since Callens presented written documentation of his co-workers' energetic defenses of him against those charges—all before he wrote his letter or filed his lawsuit.

---

[11]The female patients also recounted, in the concise language of Callens's brief, "a hostile staff that yelled and cursed at them, routinely placed children in solitary confinement nude with no bathroom accommodations [so] the children were forced to urinate and defecate on the floor; and a staff that turned a blind eye to rampant and open homosexual activity [by patients] on the unit."  Such alleged conditions were cited by Callens as motivating his letter to McMurtry.

¶41.    There is also again the matter of timing. Despite having been written up only once for any violation of hospital rules,[12] and that having been the least consequential level of official reprimand, Callens was called in on a Thursday and reproached for having written a letter to McMurtry, and then fired the following Monday.

¶42.    Even if the letter precipitated a review of Callens's work in which the various deficiencies alleged at trial were aired, that fact need not compel a finding for Martinez. The mere existence of objective evidence to support a termination does not suffice: "In short, the question is **not** whether the employer justifiably **could** have made the same decision but **whether it actually would have done so**." *El Paso*, 730 F.2d at 265 (emphasis added). "It is not necessary that the improper motive be the final link in the chain of causation: if an improper motive sets in motion the events that lead to termination that would not otherwise occur, intermediate steps in the chain of causation do not necessarily defeat the plaintiff's claim." *Id.* at 266 (citation & quotation marks omitted).

¶43.    Here, the jury had substantial evidence from which to infer that Callens's work and professionalism were not found wanting by Martinez until he learned that Callens had gone over his head to McMurtry via the letter. Thus, the jury was justified in finding that Martinez had failed to prove by a preponderance of the evidence that the termination would have happened when and how it did, regardless of the letter. Accordingly, the jury's verdict is beyond the authority of this Court to disturb.

---

[12]Callens received a Type I reprimand, on a scale of I to III, for arguing with a nurse after he had spoken to a patient who was in "time out," which is a period of time when a patient can neither speak nor be spoken to. He testified that the nurse had threatened to increase the girl's penalty because Callens had spoken to her, and that he argued against punishing the girl for an incident which he admitted to be his fault. According to Callens, no discipline was imposed on the nurse, and this type of inaction was but an example of what caused Callens to conclude that complaining to Martinez would be futile.

### C. Were the Jury Instructions Faulty?

¶44.    The State also alleges on appeal that the jury instructions were so faulty as to require reversal. "The instructions referred to 'Defendant,' 'Defendants,' 'Defendants',' and 'Defendant's' **throughout**, implying all named Defendants." The jury instructions were no doubt repetitive and lengthy, but it is crucial here to sent out verbatim Jury Instruction No. P-1 (with paragraph numbers supplied):

[1] It is unlawful under 42 USC § 1983 for a person acting "under color of state law" to retaliate against a state employee who has engaged in an activity that is protected by the free speech provision of the First Amendment of the United States Constitution. "Under color of the law" means Dr. **Ramirez [sic]** and/or Mr. **McMurtry** were acting within their lawful authority when they terminated Callens. However, they also may have acted "under color of state law" if they acted without lawful authority or beyond the bounds of their lawful authority if their acts were committed while purporting or pretending to act in performance of their official duties. Dr. **Martinez** and/or Mr. **McMurtry** may also have acted "under color of state law" if they abused or misused their power as an official by committing a wrongful act or failing to act when they should have.

[2] To prevail on his claim of having been retaliated against for reporting patient neglect and abuse, Dr. Callens must prove by a preponderance of the evidence that the Defendants' termination of him was motivated by his exercise of his First Amendment free speech rights. Dr. Callens' speech is protected under the First Amendment if it was speech involving a matter of public concern and, under all of the circumstances, it did not unduly interfere with the duties and responsibilities of Dr. Callens' employment.

[3] Dr. Callens does not have to prove that Dr. **Martinez** intentionally terminated him solely based on his speech activities, but that Dr. Callens' report was a substantial consideration that made a difference or influenced Dr. **Martinez**'s decision.

[4] If you find from a preponderance of the evidence that the Defendant took adverse action against the Plaintiff at least in part because of his opposition to what he reasonably believed to be patient neglect and abuse at EMSH, then you must decide whether the Defendant has shown by a preponderance of the evidence that the Defendant would have terminated Dr. Callens even if he had not engaged in protected speech activities.

[5] If you find that the Defendant would have fired Dr. Callens for reasons wholly apart from his free speech activities, then your verdict should be for the Defendant. If you find, however, that the Defendant has not shown an independent reason to terminate Dr. Callens, you must find his termination was in retaliation for exercise of Dr. Callens's First Amendment rights and you may award damages against Dr. **Martinez**.

[6] If you find that Dr. Callens proved by a preponderance of the evidence that the Defendant, Mr. **McMurtry**, as bureau chief of the Mississippi Department of Mental Health with direct supervisory authority over East Mississippi State Hospital and Dr. Martinez, failed to act or was deliberately indifferent regarding the actions of Dr. Martinez in terminating Callens, which were in violation of Dr. Callens' rights, then you must find that **McMurtry** is liable to Dr. Callens for violation of Dr. Callens' rights under 42 USC § 1983 and you may award damages against Mr. **McMurtry**.

(emphasis added). We thus disagree with the State's assertions. While the instruction does shift between naming the parties (and once misnaming Martinez as Ramirez) and referring to "the Defendant," there is no doubt that "the Defendant" in paragraphs 4 and 5 is indeed a reference to Martinez, the last defendant named prior to that term's use. Likewise, the plural "Defendants" in paragraph 2 without question is a reference to the only two defendants named in the instruction. We conclude that this instruction did not confuse the jury as to whom Callens was suing under § 1983. In fact, the only instructions that used the blanket term "Defendants" were those offered *by the defense*.

¶45. Nor does the instruction support the State's claim that the proper law was never presented to the jury, which was in fact instructed on both causation issues. The instruction given was actually unduly favorable to Martinez. In the next to last paragraph of the instruction, the jury is told that it should find against Martinez if he had "not shown an independent reason to terminate Dr. Callens." Actually, as *El Paso* demonstrates, an objective, independent *reason to fire* is not enough to achieve qualified immunity; one must also show that the firing *would have occurred* regardless.[13]

---

[13]Relatedly, the State argues that Instruction P-1 misstated the law as laid down by the U.S. Supreme Court in *Mt. Healthy*. That opinion, however, stated that the defendant needed to "show[ ] by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct." 429 U.S. at 287. Thus, the language in Instruction P-1 "would have fired Dr. Callens for reasons wholly apart from his free speech activities" is strikingly similar to the *Mt. Healthy* criteria. The State argues that if "a legitimate motive was a ground for termination and the employer credibly testifies that the same action would have [been] or was taken for that

28

¶46. The State also raised the refusal of its instructions D-2 and D-4, though it does not specifically allege that their refusal was reversible error. In any event, those instructions largely duplicated the substance of P-1 and other instructions (including Instruction D-3, which was given). Thus we find no reversible error in instructing the jury.

## II. SHOULD THE JURY HAVE BEEN ALLOWED TO CONSIDER PUNITIVE DAMAGES?

¶47. Callens argues that the trial court erroneously denied a punitive damages instruction for consideration by the jury. The record reveals that the trial court stated:

> I am still going to follow our procedure as far as submitting a punitive damage question to the jury. So once the jury has returned a verdict on actual damages, then you would be entitled to present your arguments concerning whether or not that punitive damage question should be presented to the jury.

However, the transcript does not include any proceedings after the jury returned with its verdict, except for the trial court's judgment on the Tort Claims Act issues and on the statutory award of attorney's fees under 42 U.S.C. § 1988.

¶48. The record does not reveal that counsel for Callens ever sought to have the jury instructed on punitive damages after the verdict was returned. Nor did counsel present to the trial court any post-trial motion alleging error on this point. Accordingly, we conclude here that there is no basis on which to rule that state law impeded Callens's substantive rights under federal law, thus, this assignment of error is without merit.

---

motive alone, termination is justified regardless of unlawful motivation." First, *El Paso* suggests otherwise. Second, the key words in that quotation from the State are "***credibly testifies***." The jury was charged with evaluating credibility, and evidently its evaluation differed from the State's. Therefore the trial court's granting of Instruction P-1 (the only instruction on which the State focuses) did not constitute reversible error.

## OTHER ISSUES NOT DISCUSSED IN THE COURT OF APPEALS' OPINION

¶49. Because of its decision to reverse and render based on our decision in *Hood*, the Court of Appeals understandably did not address certain issues which we must now discuss in light of our decision today.

## THE TORT CLAIMS ACT

¶50. Because of our decision today, we must also address the trial court's separate hearing and resulting additional award of $50,000 under the Mississippi Tort Claims Act (MTCA), codified as Miss. Code Ann. §§ 11-46-1 et seq. Pursuant to the jury verdict of May 19, 1999, the trial judge, on May 25, 1999, entered a judgment in favor of Callens in the amount of $125,000. On June 7, 1999, the same trial judge conducted a "hearing," without a jury, to consider additional damages pursuant to the MTCA. While we readily acknowledge that the trial judge had the benefit of all the evidence presented at the jury trial which had been concluded just days before, we also note that the "bench trial" conducted pursuant to the MTCA consisted merely of argument of counsel. Callens's attorney argued to the trial judge, inter alia, that "it is my understanding that we are capped at $50,000 under the (MTCA), given the year in which it was filed...." The defendants' attorney basically argued the non-applicability of the MTCA. The trial judge then stated:

> Okay. Well, I am going to view this in the most liberal posture the trial court could take and that would be that there is a circumstance where a 1983 action could survive against individuals of a state entity, and at the same time the Tort Claims Act cause of action could exist against the agency itself. There is certainly some question as to whether those two causes of action are available to the plaintiff in the same cause of action.
>
> There hasn't been any evidence of the presence of insurance for the department, and the Court would grant judgment in the amount of $50,000.

30

¶51.    On October 13, 1999, the trial court, pursuant to 42 U.S.C. § 1988, entered an order awarding to Callens the additional sum of $114,569.14 for attorney's fees and expenses. On October 26, 1999, the trial court entered a final judgment for Callens in the total amount of $289,569.14 ($125,000 pursuant to the jury verdict; $114,569.14 pursuant to the 42 U.S.C. § 1988 award; and, $50,000 pursuant to the MTCA). The final judgment stated in pertinent part:

> In addition, pursuant to the (MTCA), the Court has considered the claim of the Plaintiff for termination in violation of public policy and finds in favor of the Plaintiff and has determined that the evidence supports an additional award of $50,000 in damages.

¶52.    While the record on the MTCA is albeit scant, we readily acknowledge that a trial court judgment is presumptively correct, absent evidence to the contrary, *Alexander v. State*, 759 So.2d 411, 418 (Miss. 2000); *Pierre v. State*, 607 So.2d 43, 48 (Miss. 1992), and here, the defendants offer nothing to indicate that the trial court was in error by awarding the sum of $50,000 under the MTCA. Also, we again emphasize that the trial judge had the benefit of his recall of all the evidence presented at the trial of this case. Thus, we affirm the trial court's award under the MTCA, but consistent with the provisions of the MTCA, the award is against the state agencies, East Mississippi State Hospital and the Mississippi Department of Mental Health, and not against the individual defendants, Martinez and McMurtry.

### ATTORNEY'S FEES UNDER 42 U.S.C. § 1988

¶53.    As previously noted, in addition to the entry of the judgment based on the jury verdict and the MTCA award, the trial court likewise entered a judgment awarding attorney's fees and expenses to Callens under 42 U.S.C. § 1988. Based on the totality of the record, the trial court was justified in its award of § 1988 attorney's fees and expenses in the amount of $114,569.14; however, it must be clarified here as against whom the award may and should be made. From the record it is clear that the award was

appropriate as against the state agency defendants and Martinez, but not as to McMurtry. *Hutto v. Finney*, 437 U.S. 678, 699-700, 98 S.Ct. 2565, 2578, 57 L.Ed.2d 522 (1978). Based on the actions of Martinez and consistent with pronouncements of the United States Supreme Court in *Hutto*, inasmuch as their agent, Martinez violated federal law, the state defendants, the Hospital and MDMH, may be liable for § 1988 attorney's fees and expenses.

## CONCLUSION

¶54. We are in no way by our decision today undermining our well established statutorily mandated administrative remedies available to one dismissed from state civil service employment. The applicable statutes and our cases interpreting these statutes are still good law. We simply clarify today that when an individual, such as Dr. Callens, is discharged by a state agency, and that individual, as a result of such discharge, asserts a claim actionable under 42 U.S.C. § 1983 against one or more state officials in their personal (individual) capacities, that claim may be appropriately asserted via an action commenced in our state courts. Our learned judges of the Court of Appeals, in three separate opinions, quite appropriately focused on the resulting procedural problems in trying to fit § 1983 actions into our statutory scheme concerning limited judicial review of administrative appeals based solely on the administrative record. Judge Irving, in a separate concurring opinion, concluded that "by writ of certiorari, the Mississippi Supreme Court can address this problem and correct the prejudice, if any, suffered by Callens as a result of the procedural and substantive shortcomings inherent in having a 42 U.S.C. § 1983 claim heard by an administrative board such as the Employee Appeals Board." *East Miss. State Hosp. v. Callens*, ¶ 32. We have today accepted that invitation.

32

¶55.    Even though our decisions in *Hood*, *Wright*, and other cases, are factually and procedurally dissimilar to the case sub judice, we make clear today that these prior decisions should in no way in the future be applied so as to deny a discharged state employee the right to assert appropriate § 1983 claims against state officials in their personal or individual capacities. To the extent that *Hood* and *Wright* could be interpreted as a denial of that right, they are overruled to that limited extent.

¶56.    Accordingly, for the reasons stated, to the extent that the trial court awarded Jimmy B. Callens the sum of $125,000 pursuant to the jury verdict, the judgment is affirmed against Dr. Ramiro J. Martinez, individually, but reversed and rendered as to East Mississippi State Hospital, the Mississippi Department of Mental Health, and Roger McMurtry.  To the extent that the trial court awarded Jimmy B. Callens the sum of $50,000 under the MTCA for wrongful termination in violation of public policy, the judgment is affirmed against East Mississippi State Hospital and the Mississippi Department of Mental Health, but reversed and rendered as to Dr. Ramiro J. Martinez and Roger McMurtry.  To the extent that the trial court awarded Jimmy B. Callens the sum of $114,569.14 in attorney's fees and expenses under 42 U.S.C. § 1988, the judgment is affirmed against East Mississippi State Hospital, the Mississippi Department of Mental Health, and Dr. Ramiro J. Martinez, but reversed and rendered as to Roger McMurtry.  To the extent that the trial court refused to submit the issue of punitive damages to the jury, the judgment is affirmed.

¶57.    In sum, the judgment of the Court of Appeals is reversed, and the trial court judgment is affirmed in part and reversed and rendered in part.

¶58.    **THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED, AND THE JUDGMENT OF THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT OF**

**HINDS COUNTY IS AFFIRMED IN PART AND REVERSED AND RENDERED IN PART.**

**SMITH, C.J., WALLER AND COBB, P.JJ., GRAVES AND DICKINSON, JJ., CONCUR. EASLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. DIAZ, J., NOT PARTICIPATING.**